A. F. HUBER v. GUSTAF JOHNSON.[v]

April 26, 1897.

Nos. 10,465—(117).

**Contract to Bring Suit—Validity—Public Policy.**

The defendant having a claim for unliquidated damages against a railway company, he and plaintiff entered into a contract by which the plaintiff, who was a stranger to both the defendant and the claim, was to employ an attorney, and institute a suit in the name of the defendant for the collection of the claim, but wholly at his own cost. As compensation for his services, plaintiff was to have an amount equal to one-half of what was collected; but, if nothing was collected, he was not to charge

[1] Reported in 70 N. W. 806.

anything for his services. Plaintiff might cancel and annul the contract whenever he became satisfied that the claim was not valid for a sufficient sum to warrant his proceeding further. The contract further provides that the defendant should not settle the claim without plaintiff's written consent, and if he did, he was to pay the plaintiff $75. Defendant did settle the claim without plaintiff's consent. *Held*, in an action to recover the $75 stipulated for, that the contract was against public policy, and void.

'Appeal by plaintiff from an order of the district court for Grant county, C. L. Brown, J., sustaining a demurrer to the complaint. Affirmed.

*L. W. Gammons*, for appellant.

There are two essential elements in every champertous agreement: First. There must be an undertaking by one person to defray the expenses, in whole or in part, of another's suit. Second. An engagement or promise on the part of the latter to divide with the former the proceeds of the litigation in the event it proves successful. Torrence v. Shedd, 112 Ill. 475. An essential element of champerty is sharing the fruits of litigation. Blaisdell v. Ahern, 144 Mass. 395. See also Stearns v. Felker, 28 Wis. 594; Christie v. Sawyer, 44 N. H. 298, and Ogden v. Des Arts, 4 Duer, 275. Appellant's contract was simply for an amount equal to one-half of whatever sum may be collected upon said claim. Such a contract is valid. See Wilhite v. Roberts, 4 Dana, 172; Ramsey v. Trent, 10 B. Mon. 336; Evans v. Bell, 6 Dana, 479; McPherson v. Cox, 96 U. S. 404, and Stotsenburg v. Marks, 79 Ind. 193. The ancient laws of champerty and maintenance never became a part of the common law of this country. Lytle v. State, 17 Ark. 608; Roberts v. Cooper, 20 How. 467. They prevail only so far as preserved by statute. Mathewson v. Fitch, 22 Cal. 94; Fowler v. Callaan, 102 N. Y. 397; Bentinck v. Franklin, 38 Tex. 458; Scromp v. Schenck, 40 N. J. L. 195; Danforth v. Streeter, 28 Vt. 490; Adye v. Hanna, 47 La. 264. Even in a state where they are held part of the common law, a contract substantially like the one at bar was sustained, Ryan v. Martin, 16 Wis. 57. If ever in force in Minnesota, they have been repealed. Nor is the contract against public policy. Ryan v. Martin, supra; Sherley v. Riggs, 30 Tenn. 52, and Brown v. Bigne, 21 Ore. 260.

*Wm. R. Begg*, for respondent.

The doctrine that contracts tainted with champerty and mainten-ance are void is in force in Minnesota. The common law, so far as ap-plicable to our situation and government, is the law of this state ex-cept where abrogated by statute. State v. Pulle, 12 Minn. 99 (165). Champerty and maintenance were forbidden by and were illegal at common law. Barker v. Barker, 14 Wis. 131; Martin v. Veeder, 20 Wis. 466; Allard v. Lamirande, 29 Wis. 502; Lytle v. State, 17 Ark. 608; Aultman v. Waddle, 40 Kan. 195; Boardman v. Thompson, 25 Ia. 487; Ackert v. Barker, 131 Mass. 436; Lyon v. Hussey, 31 N. Y. S. 281; Weakly v. Hall, 13 Ohio, 167, and Duke v. Harper, 66 Mo. 51. The common-law doctrine has not been abrogated by statute, but merely modified. Sullivan v. La Crosse, 10 Minn. 308 (386); Blackman v. Wheaton, 13 Minn. 299 (326). The contract on which this action is brought is inhibited by the common law, as that law exists in Minne-sota, and is contrary to public policy. Miller v. Larson, 19 Wis. 463; Kelly v. Kelly, 86 Wis. 170; Dahms v. Sears, 13 Or. 47; Lyon v. Hus-sey, supra; Lathrop v. President, 9 Metc. 489; Ackert v. Barker, supra; Boardman v. Thompson, supra; Keiser v. Miller, 68 Fed. 627; Hamil-ton v. Gray, 67 Vt. 233; Stearns v. Felker, 28 Wis. 594; Johnson v. Hilton, 96 Ga. 577; Key v. Vattier, 1 Ohio, 132; Arden v. Patterson, 5 Johns. Ch. 48, and Duke v. Harper, supra.

MITCHELL, J. This appeal is from an order sustaining a demur-rer to the complaint. Briefly stated, the allegations of the complaint were that defendant having a claim against a railway company for damages for its failure to fence its road where it ran through his farm, he and plaintiff entered into an agreement by the terms of which the former employed the latter to adjust, compromise, settle, and collect this claim, and authorized plaintiff to employ an attorney to assist him in the matter, and to prosecute the claim by suit or otherwise in the name of the defendant, but at his, plaintiff's, own cost; that plain-tiff should have for his services "an amount equal to one-half of what-ever sum may be collected upon said claim," but that plaintiff should not charge defendant anything for his services unless he succeeded in collecting the claim; that defendant should not settle the claim with-out plaintiff's consent in writing; that, if he did settle it without plaintiff's consent, he should pay the latter $75 within 10 days after making the settlement, "which said sum is hereby agreed upon as full

compensation in such case for any services performed by second party hereunder." The contract further provided that whenever the plaintiff became satisfied that the claim was not good and valid for a sufficient sum to warrant his proceeding further, he might cancel and annul the agreement and all obligations thereunder. It also contained a general power of attorney from the defendant to the plaintiff to do and perform all and every act requisite or necessary in the premises as fully as defendant could do if personally present.

The complaint alleged that the plaintiff entered upon the performance of the contract, employed an attorney, and brought an action to collect the claim, which was at issue and ready for trial when defendant, without the knowledge or consent of the plaintiff, settled the claim with the railway company for "a large sum of money"; that more than 10 days had elapsed since the defendant so settled the claim; that plaintiff demanded of him the payment of the $75, the sum agreed in the contract to be paid in such event, but that defendant refused, and still refuses, to pay the same; that said sum of $75 is the reasonable value for the services rendered by plaintiff for defendant in the matter.

The case has been argued and submitted on the assumption or concession by the respective counsel that plaintiff was a layman, and not an attorney; that he had no interest in the claim except what he acquired under this contract; and that he was in no way connected with the defendant by the ties of consanguinity, affinity, or otherwise. Neither have the counsel discussed the questions whether, if the contract was void, the plaintiff could recover the reasonable value of the services actually rendered, and, if so, whether the complaint is sufficient to entitle him to recover on that ground. On the contrary, both sides have treated the action as one on the express contract, and defendant's counsel himself says that the only question is as to the validity of that contract. Therefore that is the only question which we shall consider, and we shall do so upon the same basis of facts which counsel have assumed in their argument.

The contention of the defendant is that the contract is void, as champertous, and as being against public policy. It is unnecessary to consider any disagreement among the common-law authorities as to the exact definition of champerty, for under any of them this agree-

ment was clearly champertous at common law.    Plaintiff's counsel claims that it would not have been so, because it does not provide that the plaintiff should have any part of or interest in the thing recovered, but merely that the amount of his compensation was to be a sum equal to one-half of the amount recovered.    Notwithstanding some decisions apparently supporting this contention, we think that it is a distinction without a difference.    In view of the abuses and evils against which the law against champerty was aimed, there is no substantial distinction between the two forms of words.    If the law against champerty prevails in this state, and if it is to be enforced at all, the courts would not be justified in splitting hairs, and making a distinction based on a mere verbal quibble.

The common-law rules relating to champerty and maintenance mainly rest on early English statutes, and it is contended that these statutes were never in force as a part of the common law of this country.    In the majority of the states it seems to be held that these rules, at least so far as adapted to our state of society, are still in force as a part of the common law, except so far as they have been changed by statute.    In a number of states, however, it has been held that these early English statutes were never in force as a part of the common law, that they had their origin entirely in the state of society existing under the feudal system, and are wholly unsuited to our social and political system.    So far as many of their provisions are concerned, this is doubtless true.    But the essential principle upon which these statutes proceeded, and the evils and abuses at which they were aimed, are as old as human society, and will continue as long as human society exists.

The general purpose of the law against champerty and maintenance was to prevent officious intermeddlers from stirring up strife and contention by vexatious or speculative litigation which would disturb the peace of society, lead to corrupt practices, and pervert the remedial process of the law.    The principle upon which it proceeded was that contracts conducive of such results were against public policy.    Blackstone speaks of men who are perpetually endeavoring to disturb the repose of their neighbors, and officiously interfering with other men's quarrels, as "the pests of civil society."    This view was not peculiar to the common law.    The Roman law animadverted with equal severi-

ty on this class of men and their practices. This class of men in the form of "prowling assignees" and intermeddling speculators are unfortunately just as numerous, and their practices just as pernicious, as they ever were. It is no doubt true that the changes in the law making choses in action and rights of entry assignable, and giving parties the unrestricted right to agree with their attorneys as to the measure and mode of their compensation, have so emasculated the common-law rules against champerty and maintenance, that it is difficult to determine how much, if anything, of the old English statutes on the subject remains in force. But that is a question which it is not necessary to consider. We do not think that any court, even of those which hold that these statutes are not in force, has ever gone so far as to hold that contracts may not so manifestly tend to stir up strife and contention and vexatious and speculative litigation, and prevent the amicable compromise of claims between citizens, as to be void on grounds of public policy.

The contract under consideration is, in our judgment, one of this class. Here a party, who is a stranger to both the defendant and the claim which is the subject of the contract, and has no object in intermeddling with the matter except a speculative one, undertakes to hire an attorney, and prosecute a suit for the collection of the claim, entirely at his own cost and expense, for the half of what he may collect on it. He does not even obligate himself to perform any service for the owner of the claim, for it is provided that whenever he becomes satisfied that he cannot collect enough on the claim to warrant his proceeding further, that is, whenever he thinks the speculation is not going to prove very profitable to him, he may cancel and annul the entire contract. But there is a still more objectionable provision in this contract, one upon which we mainly rest our decision. It is the one which binds the defendant not to settle the claim without the written consent of the plaintiff, and provides that, if he does settle without plaintiff's consent, he shall pay the plaintiff a fixed and arbitrary sum, without any regard to the amount or value of the services which the latter may have performed. The law favors the compromise of disputes without litigation, and it is difficult to conceive of any stipulation more against public policy than one which prohibits a party from settling his own dispute, or at least prevents it except by his subject-

ing himself to the payment of an arbitrary penalty for doing so; and this is the stipulation which plaintiff is seeking to enforce in this action. We think it is void as against public policy.

Order affirmed.

CANTY, J. I concur on the ground that it is against public policy to give a layman the power to prevent the compromise or settlement of litigation between other parties by giving him the right to exact a bonus or arbitrary sum on such settlement. Such a layman is not presumed to be learned in the law, or to know when it is for the best interest of the party to compromise and settle. Even if he should be learned in the law, he owes no sworn duty to the party, and no such duty as that of attorney to client, is not an officer of the court, is not under the court's direction or discipline, and has no reputation to make or lose in a learned profession. I see nothing else in this contract which, taken alone, is against public policy. Under our law, a person has a right to buy land held adversely to the grantor, and to buy disputed claims and choses in action on which nothing can be realized except by litigation. He has also a right to buy an interest in such a claim, leaving the title and right to bring suit in the original holder of the claim. But, while isolated transactions of such a character may not be champertous, or against public policy, a systematic prowling around and bringing to light of stale claims on which the original holders would probably never have asserted any right or taken any action, and the stirring up of litigation on such claims, is a crying evil, which, in my opinion, is against public policy. Such stirring up of litigation may be regarded as a species of nuisance. One isolated act or transaction might not constitute such a nuisance, while a series of such acts or transactions, or a practice of stirring up such litigation, would. But, for all that appears, the transaction now before the court is a mere isolated or casual one, and this plaintiff may not have stirred up the litigation contemplated in his contract at all, but the defendant may always have asserted the claim on which he brought the suit.