YOUNG *v.* YOUNG.

1. CONTRACTS — CHAMPERTOUS AGREEMENTS — VALIDITY — PUBLIC POLICY.

A paper, signed by a wife in ignorance of its contents, by which she agrees to pay to a certain person part of all moneys, lands, or other property that may be received by her in settlement of a suit to be instituted by her against her husband, and to make no settlement less than a stated sum, and such person agreeing therein to furnish counsel to represent the wife in such suit, is void as being against public policy.

2. DIVORCE—CHAMPERTOUS AGREEMENTS—EVIDENCE—GOOD FAITH.

Evidence *held*, sufficient to show that plaintiff instituted the suit against her husband for divorce in good faith, although she was in ignorance of the contents of the agreement, so as not to warrant the dismissal of the bill. KUHN, C. J., and OSTRANDER and BIRD, JJ., dissenting.

3. SAME—ALIMONY—PAYMENT—DISCRETION OF COURT.

Monthly installments for life, instead of permanent alimony in a lump sum, should be given a wife where she is a woman of middle life, unable to go out to service, and subject to imposition by others.

Appeal from Calhoun; Tucker, J., presiding. Submitted January 15, 1917. (Docket No. 129.) Decided May 31, 1917.

Bill by Eugena Young against Myron Young for a divorce. From a decree for plaintiff, defendant appeals. Modified and affirmed.

*H. Attix Kinch* (*Clink & Farmer*, of counsel), for plaintiff.

*Colgrove & Potter*, for defendant.

FELLOWS, J. The defendant at the time this cause was tried in the court below was 63 years old and the, plaintiff 57. They were married July 27, 1898, and their separation took place the fore part of September, 1915. Both had been married before, the defendant's wife having died in 1894, leaving one child, a daughter seven or eight years old. Plaintiff had a somewhat checkered matrimonial career prior to her marriage to defendant. When 16 years of age she had married a man named Clark, with whom she lived but a month, and then divorced him. In 1877 she married a man named Mudica, with whom she lived until his death in 1888. In 1893 she married a man named Murdock, with whom she lived but a short time, and was divorced from him, due to his dissolute habits. In 1895 she married him again on his promise to lead a better life; in this she was disappointed and left him in a few days. She was divorced from him in 1897, the defendant advancing her money to pay for the divorce. For over a year prior to her marriage to defendant she had been a domestic in his household. She was at the time of her marriage to him 40 years old. No children were born to them. The defendant's family at that time consisted of himself, his daughter, and his aged father. He was conducting a large farm and had considerable hired help.

It will be unnecessary to set forth in detail the pleadings or the testimony taken at the hearing bearing on their domestic affairs and troubles. After a careful reading of this record we agree with the circuit judge, who saw the witnesses and was well able to judge of their credibility, that the plaintiff had made out a case. We quote from his opinion:

"She had been living in the home of defendant as his housekeeper for about a year prior to her marriage to him, and the parties seem to have had ample opportunity to become thoroughly acquainted with each other prior to their marriage.

"Plaintiff's mother lives at a place called Yankee Springs, some distance from Battle Creek, and is in poor circumstances. Plaintiff also has several sisters who are not well-to-do. Her mother lived at the home of defendant for at least a part of the time while plaintiff acted as housekeeper, and one of the sisters and her husband at one time worked defendant's farm.

"The plaintiff has been devoted to her mother, and defendant complains that she has constantly given her money and merchandise at his expense. As to that, I consider it of no consequence. All the proofs show that whatever she did give her was of small value and was quite the natural thing.

"Plaintiff's contention is that the defendant was constantly making sneering and abusive remarks about her mother and family, that he was penurious to the last degree with her; was constantly swearing at and about her, telling obscene stories in her presence, and that he made foul and indecent suggestions about her to other men. That a large part of these charges are true I have not the least doubt.

"The defendant gives but one instance of any unwomanly conduct on her part, and that was an unbelievably vile piece of abuse which he claims was directed at him when she was in a fit of anger. It was told with apparent gusto, and I am inclined to discredit it entirely. Defendant did testify to a couple of threats against him by plaintiff which amounted to assault, but I take little stock in them. All of the testimony outside of that, including defendant's own, goes to show that plaintiff was a hard-working, industrious

woman of kindly disposition and a competent house-keeper. No pretense is made that she ever abused or mistreated defendant personally in any way, aside from the incidents above referred to."

We think it should also be stated that the record discloses that she was all that could be expected of a mother in the treatment of defendant's daughter, who was 11 or 12 years old at the time of the marriage, and who was never strong physically and needed a great deal of care. The proof demonstrates this, and defendant admits it. That she was kind and considerate to defendant's aged father is also established. It should also be stated that when the parties were married defendant owed something over $3,000, and that with the assistance of plaintiff's economy and good management this was wiped out and a comfortable balance appeared in his bank account. It also appeared in the proof, and we are satisfied, that defendant frequently called her vile names, names imputing a want of chastity; we are satisfied that she was a good woman and fully discharged her duty to the defendant during the upwards of 17 years they lived together.

The defendant not only denies the charges made by plaintiff, but insists in his defense, and this feature of the case is the one most strenuously urged in the brief and oral argument, that this bill was filed as the result of a conspiracy between plaintiff and a man named John H. Quilhot to procure a large amount of money from him by this proceeding, either by way of settlement or decree, and that but for Quilhot this proceeding would not have been instituted. This necessitates a stating of the facts appearing in the testimony bearing on this branch of the case at a greater length than we have felt the case required on the other features.

While the record contains more of insinuations

against Quilhot than it does actual tangible evidence, we are satisfied from the evidence that was produced and his connection with this case that he was an adventurer and a crook, and that, so far as his connection with the case was concerned, his motives were purely mercenary.

Prefacing the first meeting between plaintiff and Quilhot, we think it should be stated that it fairly appears that defendant had so arranged the disposition of his property after death as that plaintiff would only receive such part thereof as she would receive by law, and that plaintiff had been made conversant of that fact, that she had purchased a little piece of real estate near her mother's on a contract; that there was $50 due on the contract which she was unable to pay, and that defendant had refused to let her have this small sum, although he was a man worth somewhere between $20,000 and $25,000. This is not stated in justification of her acceptance of financial assistance from a stranger, but as showing the state of her mind when she first met this smooth and unscrupulous adventurer.

Plaintiff first met Quilhot on an interurban car on September 1st, when she was on her way to Richland Junction to take a train to Hastings. She testifies, and it is all the testimony there is in the case on the subject, that she was crying over the way her husband was treating her. She at that time expected that she was about to lose this little piece of land through inability to make the small payment. She was approached by a stranger who inquired if she was sick. She informed him she was not. He persisted in conversation with her, and finally learned that she was in trouble. He then informed her that he was an attorney, and offered his assistance. Before the conversation ended he learned what her trouble was with reference to the land, and also received information

from which he could shrewdly guess that she was having trouble with her husband. As a result of this conversation he offered her a loan and did loan her $90, taking a note from her for $105. After this she saw Quilhot on several occasions and he interested himself in her affairs. Both her attorneys were employed through him. She met her attorney at his residence in Battle Creek, but we do not believe she was over there except on the occasions when she met counsel. She had no means of her own, and he made some small advancements for expenses of the suit and for her to live on, and finally took a deed in the name of a woman whom he called his step-daughter by the name of Dargusch of the land plaintiff had contracted to purchase.

On the cross-examination of plaintiff she was shown a paper which seems to be admitted to be in the handwriting of the Dargusch woman, and the signature of which is admitted by plaintiff to be hers. She, however, denies that she ever signed any such paper, or if signed by her, that she did not know its contents; that she did sign a paper the day she executed the deed to the Dargusch woman; that she signed it in the Middleville station; that she did not have her glasses with her and did not read it; that it was explained to her by Quilhot that her attorneys had to have some paper showing that she would not settle the case out of court, but her attorneys should do the settling; and that she never agreed to give Quilhot a dollar. This paper is as follows:

"MIDDLEVILLE, MICH., September 1, '15.
"I, Mrs. Myron Young, of the city of Battle Creek, Mich., do hereby agree to pay to John H. Quilhot, one-half of all the money, lands or other property that may come to me in settlement of a lawsuit that I, the said Mrs. Myron Young aforesaid, will be plaintiff in, Myron Young of Battle Creek, Mich., defendant. That

no settlement of this case on my part will be made for less than sixteen thousand dollars ($16,000.00).

"John H. Quilhot, of Battle Creek, Mich., agrees on his part to furnish counsel residing outside of Calhoun county, Mich., to represent this plaintiff, wherein Myron Young is defendant, reputed to be worth about fifty thousand dollars, said Quilhot to receive his money the same day that this plaintiff in final judgment of the litigation herein referred to.

"Mrs. MYRON YOUNG."

It is admitted that this paper was not signed the day it bears date. If it was signed the day the deed was executed to the Dargusch woman, as testified to by plaintiff, it was signed November 18th. Plaintiff says she does not think she saw Quilhot after the signing of the paper. The paper was a nullity; as a contract it was void as contrary to public policy. If it was executed with full knowledge of its contents, if this bill was filed as a result of a conspiracy to bleed the defendant, or if this proceeding was instituted because of Quilhot's influence over plaintiff, and not by reason of a good faith grievance, her bill should be dismissed.

There is no evidence in the case as to the signing of this paper, except that given by the plaintiff, which we have related. It was drawn by Etta Dargusch, who was apparently a tool of Quilhot, but who does not claim to have been present when it was signed. Plaintiff should have signed no papers without first knowing their contents; but she was a weak woman in the hands of a smooth adventurer. She and her husband were having trouble, her relatives were financially unable to assist her in her extremity, her little piece of land would have been taken away but for the assistance of this supposed attorney and friend, but for his assistance, given from mercenary motives it is true, she would have been without the necessities of life waiting for the case to come on. We must deal with

human nature as we find it. Plaintiff was credulous and placed confidence where no confidence was due. Had she consulted her attorneys she would have been advised as to the impropriety of signing this or any paper of similar purport. No claim is made that either of the attorneys appearing for her knew of this paper until it was exhibited to them by counsel for the defendant. They recognize its impropriety and join defendant's counsel in condemnation of Quilhot and his methods. But can we say, in the absence of any proof to the contrary, that her version of the transaction is untrue? She is corroborated on other branches of the case by several disinterested witnesses. Her 17 years of faithfulness and service to the defendant and the high esteem in which she is held by all who have known her during her married life and who are called as witnesses all convince us that we should not disregard her testimony on this point, in the absence of any testimony contradictory thereto. Nor do we think this bill is filed through the influence of Quilhot. We have already stated that plaintiff has proven her case; her grievances with her husband are real, and not imaginary; the seriousness of the breach between them is indicated by the defendant's statements on the stand that he would not live with plaintiff and that it would be impossible to try. We are satisfied that defendant has failed to meet plaintiff's case, or that he has established any grounds entitling him to a decree.

But we are satisfied that the decree as to alimony should be modified. The allowance to plaintiff was in a lump sum. The ease with which she was imposed on by Quilhot, and the execution of papers, without knowing their contents, leads us to the belief that a lump sum allowance for alimony is unwise. The plaintiff is now a woman in middle life. She cannot go out to service, and should be provided for by the one

legally chargeable with her support. We conclude that this end will be accomplished more surely by a monthly allowance than otherwise. This monthy allowance should be at the sum of $40 during the remainder of her life. The decree will be so modified, and as modified will be affirmed. The alimony will be a lien on defendant's real estate.

An allowance to plaintiff of $200 for attorney's fees, together with costs of printing the brief will be made, to be paid on the settlement of the decree.

STONE, MOORE, STEERE, and BROOKE, JJ., concurred with FELLOWS, J.

BIRD, J. (*dissenting*). It is too much of a strain on my credulity to believe that these proceedings were instituted and prosecuted in good faith. Matters were reasonably pleasant the morning plaintiff left her home, and her letters afterward indicated that she intended to return. It is more than probable, had she not met the "chance acquaintance" on the interurban car or had he observed the biblical injunction, "Whom God hath joined together let not man put asunder," she would have returned to her home and husband, and the divorce court would have heard nothing of this case.

KUHN, C. J., and OSTRANDER, J., concurred with BIRD, J.