FETTERS *v.* WITTMER OIL & GAS PROPERTIES.

CANCELLATION OF INSTRUMENTS—MINES AND MINERALS—OIL AND
     GAS LEASE—CHAMPERTY AND MAINTENANCE—EQUITY—CONTRACTS—
     PUBLIC POLICY.
     Lessors are not equitably entitled to cancellation of oil and
          gas lease, where litigation is fostered by third party under
          contract to receive lease if suit is successful; said contract
          being void as against public policy.
     CLARK, C. J., and FEAD, J., dissenting.

Appeal from Isabella; Hart (Ray), J. Submitted
October 29, 1931. (Docket No. 199, Calendar No.
36,061.) Decided April 4, 1932.

Bill by Mary Fetters and others against Wittmer
Oil & Gas Properties and others to cancel an oil and
gas lease. Decree for plaintiffs. Defendants appeal. Reversed.

*O'Keefe & O'Keefe,* for plaintiffs.

*F. H. Dodds* and *James E. Ryan* (*Carl H. Reynolds,* of counsel), for defendants.

SHARPE, J. On June 25, 1929, the plaintiff Mary
Fetters entered into a written oil and gas lease with
the defendant Wittmer Oil & Gas Properties of 40
acres of land in the county of Isabella. It provided
for the delivery to her of a stated amount of the
product, if found upon the premises, and the payment of a fixed quarterly rental until operations for
a well were begun. On October 8, 1930, the bill of
complaint was filed for the cancellation of this lease.

We quote from the answer of the defendants thereto:

"Further answering said bill of complaint, these defendants allege, on information and belief, that this litigation has been instigated and is being maintained and financed by one Edmund E. Johnston, who, these defendants are informed, has entered into a contract with plaintiffs, under the conditions of which plaintiffs' have conveyed, or have agreed to convey to the said Johnston, certain interests in the oil, gas and minerals on the property described in said bill of complaint, in consideration of the services of the said Johnston in instigating, maintaining and financing this litigation.

"In this connection, defendants further show to the court, that said Johnston is not a licensed attorney—practicing in the State of Michigan; and that this suit is but one of many that has been instigated and is being maintained and financed by the said Johnston.

"Defendants further show to the court, in this connection, that they claim that the above-mentioned contract—between said plaintiffs and said Johnston—is champertous, and is void under the laws of this State, and that plaintiffs should not be permitted the aid of this court of equity to carry out the provisions of such contract."

The proof submitted by the plaintiffs tended to establish their claim that the lessee was a common-law trust in the State of Pennsylvania, and had failed to comply with our law to entitle it to do business in this State, and that the lease was therefore unenforceable and void. The trial court so found, and entered a decree accordingly, from which the defendants have appealed.

The defendants sought to introduce proof tending to establish the allegations in their answer above

quoted. The trial court held that it was not admissible, but permitted the evidence relating thereto to be taken under the provision in 3 Comp. Laws 1929, § 14159, and it appears in the record under the heading "Segregated Testimony." It is undisputed, and discloses the following facts: That on July 29, 1930, the plaintiff Mary Fetters, the lessor in said lease, entered into a written agreement with one Edmund E. Johnston, of the city of Saginaw, which, after reciting that such lease had been given and that it had been "obtained from the party by trickery, deceit and misrepresentation," and was in fact and in law "null and void," and that she did "not feel justified in using her own means to engage in litigation necessary to move said lease as a cloud upon the said property and is wholly inexperienced in such matters," and that Johnston "has the means to engage in said litigation and is experienced therein, and is desirous of canceling and annulling said lease and the record thereof," provided that Mrs. Fetters, in consideration of the payment to her of one dollar and "the mutual covenants and agreements hereinafter set forth," agrees that, upon performance by Johnston of his "covenants and agreements hereinafter set forth," she "will forthwith execute and deliver" to him "the lease, Exhibit A, hereunto attached and made a part hereof." She further agreed to assist him "by all reasonable and lawful methods" in clearing the title to the land, "but at his expense and without any cost whatsoever to her," and she authorizes him to retain attorneys and commence a suit and "to do any and all things necessary and proper in the conduct of such litigation, and to prosecute said litigation to a successful termination, but without cost to her."

She further agreed that—

"In the event any commercial well shall be drilled contiguous to the land heretofore described, party of the first part agrees to execute and deliver on demand of second party the lease, Exhibit A, and grant him the right to enter upon said land and, if party of the second part desires, and at his own expense, to drill an offset well or wells, thereto in accordance with good oil field practice; and in the event the litigation contemplated by this contract to annul said lease is unsuccessful, then, and in that event, party of the first part agrees to reimburse party of the second part for all costs and expenses he is put to connected with said litigation, and for the cost and expenses of drilling said well, and all costs and expenses including the placing of pipes and tanks and other necessary equipment for the saving of oil, anything in this contract to the contrary notwithstanding."

In consideration of her promises, Johnston agreed to "take all necessary and proper action" in court to "proceed with all diligence at his own expense" to have the lease to the defendant Wittmer Oil & Gas Properties "set aside, canceled and annulled," but in the event of an adverse decision in the trial court he would be under no obligation to appeal the case unless on the recommendation of his attorneys, and, if so taken, he would bear the expense of the same.

It was further provided:

"The parties hereto agree that all statements, representations and agreements made by the parties in negotiating this contract are merged herein, and that no forfeiture of this contract shall be allowed unless party of the second part shall have had reasonable written notice of the cause and fails to

comply within a reasonable time thereafter, but this shall not be construed as giving a right of forfeiture where none exists under the contract.''

The evidence discloses that this contract was entered into at the solicitation of Johnston, and that he had procured like contracts from a number of others who had entered into similar leases with the Wittmer Oil & Gas Properties. Mrs. Fetters testified that she was then living with a daughter who had also given such a lease; that Johnston ''had been there a couple of times, I think, before we made up our minds that we would sign.'' (She afterwards qualified this by saying that he had been there as many as five times.) That she knew that several of her neighbors had entered into such an agreement; that she had received the rentals provided for in the lease until she signed the bill of complaint, and thereafter refused to accept the checks therefor because instructed by Johnston to do so.

In answer to the question:

''Let me ask you this, Mrs. Fetters, up until the time that you met this man Johnston you had never had any complaint in the world about your lease, had you?''—

She said: ''No, sir.'' In our opinion, this evidence was admissible, and should be considered in its bearing upon the right to maintain this suit in a court of equity. We may take judicial notice of the fact that Johnston's activities in this respect were not confined to leases to the defendant company. He secured similar contracts from other lessors in the same territory, and suits in which they were involved have been presented to this court. See *Sheahan* v. *Athens Gas Corp., post,* 331; *Wild* v. *Pure Oil Co., post,* 356; *Flood* v. *Johnston, post,* 354. It is apparent that, when unable to obtain leases

from landowners, he deliberately set about to find some reason for the cancellation of those in existence, and, if found, to secure contracts from the lessors similar to that in question.

At the common law, champerty was regarded as an offense of a high grade, as *malum in se,* and all contracts tainted with it were held to be void. This court applied that rule in the early case of *Backus* v. *Byron,* 4 Mich. 535. Many definitions of the term will be there found. We quote but one: "The unlawful maintenance of a suit in consideration of an agreement to have part of the thing in dispute, or some profit out of it." It is also said to be the intermeddling in a suit by a stranger having no interest therein under an agreement with one of the parties by which the intermeddler is to secure a part of the thing in dispute, and differs from maintenance, which is the offense of intermeddling where there is no agreement to share the proceeds. *Stotsenburg* v. *Marks,* 79 Ind. 193, 196. In 1 Bouvier's Law Dictionary (Rawle's Rev.), pp. 305, 306, after defining champerty as—

"A bargain with a plaintiff or defendant in a suit, for a portion of the land or other matter sued for, in case of a successful termination of the suit which the champertor undertakes to carry on at his own expense,"—

it is said:

"The tendency of modern decisions is, while departing from the unnecessary severity of the old law, at the same time to preserve the principle which defeats the mischief to which the old law was directed. It has been the disposition of courts to look not so much to technical distinctions, and by treating statutes on the subject as declaratory of the common law, to deal with the subject with more flexibility,

keeping in view the real object of the policy to restrain what was defined by Knight Bruce, L. J., to be 'the traffic of merchandizing in quarrels, of huckstering in litigious discord;' *Reynell* v. *Sprye,* 1 D. M. & G. 660, 686 (42 Eng. Repr. 710). In this spirit, the common-law rule relative to champerty and maintenance is no longer recognized in many states; *Bundy* v. *Newton,* 65 Hun (N. Y.), 619 (19 N. Y. Supp. 734, 29 Abb. N. C. 66); *Nickels* v. *Kane's Adm'r,* 82 Va. 309; *Brown* v. *Bigne,* 21 Ore. 260 (28 Pac. 11, 14 L. R. A. 745, 28 Am. St. Rep. 752); *Byrne* v. *Railroad Co.* (C. C.), 55 Fed. 44; *Bentinck* v. *Franklin,* 38 Tex. 458; *Campbell* v. *Everts,* 47 Tex. 102, 106.''

After the decision in *Backus* v. *Byron, supra,* in which it was held that an agreement with an attorney to prosecute an ejectment suit for an interest in the property was champertous and void, the legislature, in 1867, passed Act No. 58, which, as afterwards amended, appeared in 3 Comp. Laws 1897, § 11254, reading as follows:

''That all existing laws, rules, and provisions of law, restricting or controlling the right of a party to agree with an attorney, solicitor, or counsel, for his compensation, are repealed, and hereafter the measure of such compensation shall be left to the agreement, express or implied, of the parties.''

This provision was further amended in the judicature act (3 Comp. Laws 1915, § 12079, 3 Comp. Laws 1929, § 13600) by adding thereto:

''But any agreement by which any attorney or counselor is to receive any percentage or portion of the recovery in any cause, in consideration of his services therein, or in consideration of his having advanced or paid all, or any portion of the expenses of such cause, shall be wholly void if such employ-

ment shall have been induced by the solicitation of such attorney or counselor, or any one acting in his behalf, or at his request, without such services having been first solicited by such party.''

It will be seen that this section applies only to contracts between attorneys and clients, and in no way refers to a person intermeddling in contracts between parties, who is not an attorney. Notwithstanding the statutory provision, it was held in *Jordan* v. *Westerman,* 62 Mich. 170 (4 Am. St. Rep. 836), that:

"A contract made between a wife and her solicitors in advance of a decree for divorce and allowance of alimony, giving the solicitors one-half of such alimony, is void as against public policy.'' (Syllabus.)

Counsel for the plaintiffs rely on the holding in *Wildey* v. *Crane,* 63 Mich. 720, cited with approval in *National Adjusting Ass'n* v. *Dallavo,* 253 Mich. 239, wherein it was said that the common-law doctrine was repealed by the passage in 1867 of Act No. 58. In the latter case, Chief Justice BUTZEL expressed a doubt as to whether the doctrine as applied to other than attorneys ever existed in this State.

In *Young* v. *Young,* 196 Mich. 316, a married woman gave a stranger a writing in which she promised to pay him one-half of all moneys received by her in a divorce suit against her husband, which he promised to promote. This instrument was offered in evidence in the divorce suit, and given much consideration. In the majority opinion it was said (p. 322):

"The paper was a nullity; as a contract it was void as contrary to public policy. If it was ex-

ecuted with full knowledge of its contents, if this bill was filed as a result of a conspiracy to bleed the defendant, or if this proceeding was instituted because of Quilhot's influence over plaintiff, and not by reason of a good-faith grievance, her bill should be dismissed.''

It was, however, held that under the evidence the bill was not filed as a result thereof, and the decree was affirmed. From this holding there was dissent.

The plaintiff Mary Fetters was satisfied with the terms of her lease with the defendant Wittmer oil company. She had accepted the payments of rental due thereon until told by Johnston to return them. While in the agreement he caused the fact to be stated that her signature to the lease "was obtained * * * by trickery, deceit and misrepresentation," which rendered it null and void, we find no proof in the record tending to support such statement. His purpose was to commence a suit in her name to secure the cancellation of the lease, and, if successful, to obtain a lease to himself in which he would take the place of the defendant. The agreement stated that a copy of this proposed lease was annexed thereto, but it does not appear in the record.

In *Holland* v. *Sheehan,* 108 Minn. 362 (122 N. W. 1, 23 L. R. A. [N. S.] 510, 17 Ann. Cas. 687), an agreement between a layman and an attorney for a division of the fees collected by the latter in suits for personal injuries brought to him by the former was held to be contrary to public policy and void. In the closing paragraph of the opinion the court said:

"The intermeddler, the fomenter of litigation, has always been obnoxious, and he has received scant

treatment at the hands of the law. The business of bureauing personal injury litigation by a layman under agreement with an attorney to share in the profits is too clearly at variance with and in violation of sound morals and the general policy of the administration of justice to receive our sanction or approval.''

Public policy is defined by Bouvier (Vol. 2, p. 792) as—

"That principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good,''—

And there is added thereto:

"It has been designated by Burroughs, J., as 'an unruly horse pursuing us, and when once you get astride of it you never know where it will carry you.' *Richardson* v. *Mellish,* 2 Bing. 229, 252 (130 Eng. Repr. 294).''

In a lengthy discussion of the application of this term to contracts in 6 R. C. L. p. 712, it is said:

"It embraces all acts or contracts which tend clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel.''

"A contract by which a stranger is to sustain the expense of the prosecution or defense of litigation, especially when he is to have an interest in the result thereof, is void.'' Greenhood on Public Policy, p. 394.

"Although maintenance in its simple form and even champerty is looked upon by the courts with less disfavor than formerly, schemes to promote

litigation for the benefit of the promoter rather than for the benefit of the litigant are regarded as contrary to public policy, and will not be enforced. Contracts of 'ambulance chasers' and others who make for themselves a business or profit by promoting litigation are unenforceable.'' 3 Williston on Contracts, § 1714.

''Where A, having a right which was supposed to be of uncertain extent, likely to be resisted or questioned, and not susceptible immediately or easily of proof, and B undertook the ascertainment and establishment of this right, on the terms of the expenditure for the purpose being his, and of his having half the benefit of what should be so obtained: *held,* that such an agreement (whether it amounted strictly in point of law to champerty or maintenance so as to constitute a punishable offense or not) must be considered against the policy of the law mischievous, and such as a court of equity ought to discourage and relieve against.'' (Syllabus) *Reynell* v. *Sprye,* 1 D. M. & G. 660 (42 Eng. Repr. 710).

Somewhat similar contracts were before the supreme court of Minnesota in *Huber* v. *Johnson,* 68 Minn. 74 (70 N. W. 806, 64 Am. St. Rep. 456), *Gammons* v. *Johnson,* 69 Minn. 498 (72 N. W. 563), *Gammons* v. *Johnson,* 76 Minn. 76 (78 N. W. 1035), and *Gammons* v. *Gulbranson,* 78 Minn. 21 (80 N. W. 779), wherein it appeared that one Huber secured from 71 persons owning farms, through which a railroad passed, a contract whereby he would prosecute in their respective names, but at his own expense, claims for damages for its failure to fence its right of way, as required by the statute. These contracts were all held to be void as against public policy. In the first of these cases, after referring to the provisions of the common law rendering such contracts void because champertous, the court said:

"But the essential principle upon which these statutes proceeded, and the evils and abuses at which they were aimed, are as old as human society, and will continue as long as human society exists. The general purpose of the law against champerty and maintenance was to prevent officious inter-meddlers from stirring up strife and contention by vexatious or speculative litigation which would disturb the peace of society, lead to corrupt prac-tices and pervert the remedial process of the law. The principle upon which it proceeded was that con-tracts conducive of such results were against public policy.    Blackstone speaks of men who are per-petually endeavoring to disturb the repose of their neighbors, and officiously interfering with other men's quarrels, as 'the pests of civil society.'    This view was not peculiar to the common law.    The Roman law animadverted with equal severity on this class of men and their practices.    This class of men in the form of 'prowling assignees' and in-termeddling speculators are unfortunately just as numerous, and their practices just as pernicious, as they ever were.    *    *    *    We do not think that any court, even of those which hold that these statutes are not in force, has ever gone so far as to hold that contracts may not so manifestly tend to stir up strife and contention and vexatious and speculative litigation, and prevent the amicable compromise of claims between citizens, as to be void on grounds of public policy.    The contract under consideration is, in our judgment, one of this class.    Here a party, who is a stranger to both the defendant and the claim which is the subject of the contract, and has no ob-ject in intermeddling with the matter except a spec-ulative one, undertakes to hire an attorney, and prosecute a suit for the collection of the claim en-tirely at his own cost and expense for the half of what he may collect on it."

Upon principle as well as authority, we think it must be held that this contract was void as against public policy.

Counsel for the plaintiff insists that if the contract be in effect void as between the parties thereto the rights of the plaintiff in this suit against the defendant are not affected thereby. Reliance is placed upon the following statement of the court in *Foley* v. *Railway Co.*, 157 Mich. 67, 69:

"Even if the rule is still in force as to agreements with laymen, we think the better rule is that the contract is only void as between the parties, and does not affect the obligation of the defendant to the plaintiff. 6 Cyc. pp. 880, 881, and cases cited in notes."

In that case it appeared that one Sullivan had an arrangement with the plaintiff—

"Whereby he was to procure attorneys, help him in the prosecution of his suit, and pay the expenses of the suit, in consideration whereof he was to receive 10 per cent. up to $5,000 of the amount recovered. It also appears that the attorneys employed for plaintiff were to receive a percentage of the amount recovered as their compensation."

In *Burnes* v. *Scott*, 117 U. S. 582 (6 Sup. Ct. 865), it was held:

"The making of a champertous, and therefore under the law of the State void and illegal, contract for the prosecution of a suit to collect a promissory note, cannot be set up in bar of a recovery on the note." (Syllabus.)

In *Croco* v. *Railroad Co.*, 18 Utah, 311, 323 (54 Pac. 985, 44 L. R. A. 285), speaking of such a contract, it was said:

"Under such circumstances it does not lie in the mouth of the defendant to set up that fact for the purpose of escaping the payment of an honest debt, or avoiding a just liability."

Conceding the rule to be as stated in actions of contract or tort to recover damages alleged to be due the plaintiff, is it applicable to the facts here presented? This suit is not brought to recover any moneys due upon the lease or to collect damages for any breach thereof by the lessee. Cancellation is here sought on the claim that, at the time it was entered into, the Wittmer company was "incapable of making a valid contract in said State of Michigan." Mrs. Fetters testified, as before stated, that she accepted the rentals under it and had no complaint about it until she met Johnston. In her contract with him it was recited, as before stated, that it was obtained from her "by trickery, deceit and misrepresentation." It is apparent that she was not informed of the reason now assigned for cancellation, and that she signed the contract because she had been informed that several of her neighbors had executed similar ones.

Where a party has a claim for damages or an indebtedness due from another party, the law will not permit a defendant to escape liability by showing that the action was induced by such a contract. The sole question is whether he ought to respond in damages on the claim as made by the pleadings. But when the relief sought is, as here, the cancellation of a written instrument based entirely upon a claim of inability of the other party to enter into the contract, and it appears, as it does here, that the person with whom Mrs. Fetters has contracted is engaged in the business of securing such contracts from others and engaging in litigation thereunder,

in our opinion a court of equity should decide that it may not be used for such purpose, and that the contract, void as between the parties thereto, so taints the proceeding that the relief prayed for will not be granted. Such contracts must be measured by their tendency, and not merely by what is being done to carry them out. *Thomas* v. *Caulkett,* 57 Mich. 392 (58 Am. Rep. 369).

Contracts affecting interests in real estate are in most cases required to be in writing. If the parties thereto be satisfied with the terms thereof and accept the benefits as they accrue to them thereunder, strangers who have no interest therein should not be permitted to intermeddle and conduct a suit in a court of equity in the name of one of the contracting parties, but for the benefit of themselves. If the right to do so be here sustained, a lessee such as we have here, or others who have secured long term leases on property which has advanced in value, may well feel insecure. The right to contract concerning that which a person owns or possesses is one prized by all people. When reduced to writing and duly executed by the parties thereto, they are bound thereby, in the absence of a claim of fraud or mistake or other equitable reason for cancellation. Thereafter each of them has a right to rely on the binding force or effect thereof. And where both parties thereto are satisfied with its terms and its binding effect, a stranger, an intermeddler, who has no interest in the property affected by it, should not be permitted to seek the aid of a court of equity for its cancellation under such a contract as was here entered into.

The question presented is not whether this court has jurisdiction to hear and decide the suit, but whether, under the record presented, a court of equity ought to do so.

"Courts of equity have a very large jurisdiction in the sense of power itself. They have an important secondary jurisdiction to determine when they ought and when they ought not to use that power. Power is given in very broad field, coupled with a very broad discretion as to when and when not to use it." *Wadhams Oil Co.* v. *Tracy,* 141 Wis. 150, 156 (123 N. W. 785, 18 Ann. Cas. 779).

In treating the subject of rescission and cancellation of written instruments, in 2 Story's Equity Jurisprudence, § 934, it is said:

"Before proceeding to the consideration of these distinct and important subjects it may be proper to suggest that the application to a court of equity for either of these purposes is not, strictly speaking, a matter of absolute right, upon which the court is bound to pass a final decree. But it is a matter of sound discretion to be exercised by the court, either in granting or in refusing the relief prayed, according to its own notion of what is reasonable and proper under all the circumstances of the particular case."

In 4 R. C. L. p. 497, the rule is thus stated:

"Courts of equity have the power to order a void deed, bond, or other instrument, to be delivered up to be canceled, even in cases where the invalidity appears on the face of the instrument. Though formerly some doubt was entertained as to whether a court of equity ought to decree cancellation of instruments absolutely void at law, the authorities proceed on the general principle that the exercise of this power is to be regulated by sound discretion as the peculiar circumstances of each case may dictate, and that the resort to equity, to be sustained, must be expedient, either because the instrument is liable to abuse from its negotiable nature, or because the defense not arising on its face may be difficult or uncertain at law, or from some other

special circumstances peculiar to the case, and rendering a resort to equity highly proper, and clear of all design to promote litigation and expense.''

Mr. Justice Nelson said in *Propeller Mohawk,* 8 Wall. (75 U. S.) 153, 162, in which the plaintiff sued upon a cause of action assigned to him, and which the real party in interest declined to prosecute:

''The suit in the present case has been instituted by a volunteer, on a speculation; and we are not sorry that, upon the application of the principles of law governing it, the experiment must fail.''

Mr. Justice Bradley, in *Graham* v. *Railroad Co.,* 102 U. S. 148, quoted with approval the following from *Prosser* v. *Edmonds,* 1 Y. & C. 481, 497 (160 Eng. Repr. 196):

''All our cases of maintenance and champerty are founded on the principle that no encouragement should be given to litigation by the introduction of parties to enforce those rights which others are not disposed to enforce. There are many cases where the acts charged may not amount precisely to maintenance or champerty, yet of which upon general principles, and by analogy to such acts, a court of equity will discourage the practice.''

That the circuit court, in chancery, had jurisdiction over the parties and the subject-matter is apparent. But whether the relief of cancellation of a written instrument shall be granted must be determined by the application of the doctrines of equitable jurisprudence to the facts presented. *Venner* v. *Railway Co.,* 153 Fed. 408 (aff'd, 209 U. S. 24 [28 Sup. Ct. 328]).

In *Young* v. *Young, supra,* the agreement between the plaintiff and a third party under which he was to

receive one-half of the moneys awarded to plaintiff in a divorce case was admitted in evidence, and it was held that such agreement was void as contrary to public policy, and, if executed by plaintiff with full knowledge of its contents, her bill should be dismissed. While it may be said that a different rule should be applied in divorce cases, wherein the public are at least to some extent interested, the holding rested on the ground that the agreement was void on its face as against public policy. See, also, *Windisch* v. *Mortgage Security Corp.,* 254 Mich. 492.

In *Hathaway* v. *Hudson,* 256 Mich. 694, the following from 9 C. J. p. 1161 was quoted by Mr. Justice NORTH with approval:

"An application to a court of equity for the rescission, cancellation, or delivering up of agreements and securities is not founded on an absolute right, as in case of an action at law on a contract or in tort, but is rather an appeal to the sound discretion of the court, which in granting or refusing the relief prayed acts on its own notions of what is reasonable and just under all the surrounding circumstances."

The contract in question being void, neither of the parties thereto can acquire any enforceable rights thereunder. Mrs. Fetters could not enforce the promise of Johnston to pay the costs and expenses of litigation in case of a decision adverse to her, nor could he compel her to execute or deliver the lease to him provided for therein.

In closing, it is but fair to say that the record does not disclose that the attorneys for plaintiff had anything to do with the making of this contract or are in any way personally interested in the result of the litigation.

A decree may be here entered dismissing the bill of complaint, with costs to appellants.

Wiest, J., concurred with Sharpe, J. McDonald and Potter, JJ., concurred in the result.

North, J. I concur in holding plaintiffs are not equitably entitled to cancellation.

Butzel, J., concurred with North, J.

Clark, C. J. I am not in accord with opinion of Mr. Justice Sharpe. Defendants may not use in their defense the champertous agreement between plaintiff and a third party, not a party thereto, and to that point only, the following, from 11 C. J. p. 270:

"Except in one State (Wisconsin), the rule is well settled that the fact that there is a champertous contract in relation to the prosecution of the suit between plaintiff and his attorney, or between plaintiff and another layman, in no wise affects the obligation of defendant to plaintiff. It is the champertous contract and not the right of action itself which the contract avoids, and therefore defendant cannot avail himself of the champertous agreement as a defense to the action."

From *Foley* v. *Railway Co.,* 157 Mich. 67:

"Even if the rule is still in force as to agreements' (champertous) with laymen, we think the better rule is that the contract is only void as between the parties, and does not affect the obligation of the defendant to the plaintiff."

In *Isherwood* v. *H. L. Jenkins Lumber Co.,* 87 Minn. 388 (92 N. W. 230), it is said:

"If the plaintiff has a cause of action against the defendant on the merits, he is entitled to a speedy

and certain remedy in the laws for the wrongs he has suffered. And to permit the defendant to escape liability therefor by showing that the plaintiff had made a champertous agreement which is void would be as unjust and unreasonable as it would be to permit the defendant to escape liability by showing that the plaintiff, if such were the case, was a bad man.''

And in *Allison* v. *Railway Co.*, 42 Iowa, 274, 280:

''We are unable to perceive upon what principle a defendant can, as a defense, avail himself of the fact that a champertous contract has been entered into between the plaintiff and his attorneys for the maintaining of the suit. Such champertous contract is against public policy and void. Neither party to it can enforce it against the other. By the Roman law such contracts were severely condemned, and by the common law they were punished as misdemeanors. But how can a party exonerate himself from his agreements, or escape the consequences of his torts by showing that the opposite party is prosecuting his remedy through such agreement? If he could do so an unheard of effect would be given to a void agreement.''

And in *Woods* v. *Walsh*, 7 N. D. 376, 385 (75 N. W. 767):

''It seems to us that there is no sound reason nor just principle in a rule which would allow a party to defeat a just cause of action because the opposite party has made a contract with his attorney which is entirely void, and which, therefore, cannot be enforced by either of the contracting parties.''

And in *Hilton* v. *Woods*, L. R. 4 Eq. 432:

''But no authority was cited, nor have I met with any, which goes the length of deciding that where a plaintiff has an original and good title to property,

he becomes disqualified to sue for it by having entered into an improper bargain with his solicitor as to the mode of remunerating him for his professional services in the suit or otherwise.''

Divorce cases are not in point, as they involve the marriage relation, to which the law affords special protection. *Attorney General* v. *Marital Endowment Corp.*, 257 Mich. 691.

No distinction between cases at law and in equity is attempted; it being considered that equity will not favor a ruling condemned as unjust.

Defendant Wittmer Oil & Gas Properties is a common-law trust of Pittsburg, Pa.; and, being regarded as a corporation, comes under the provision of the statute that, to do business in this State, it must obtain from the secretary of State a certificate of authority for that purpose. 2 Comp. Laws 1929, § 10118; *Hemphill* v. *Orloff*, 238 Mich. 508 (58 A. L. R. 507). Such defendant obtained no such certificate. It, however, carried on its business in this State, which fact is so obvious on this record that it calls for no discussion. A part of that business was obtaining from plaintiffs and many others so-called oil and gas leases. See *Republic Acceptance Corp.* v. *Bennett,* 220 Mich. 249; 14A C. J. p. 1308.

2 Comp. Laws 1929, § 10120, provides:

''No foreign corporation shall be capable of making a valid contract in this State until it shall have fully complied with the requirements of the laws of this State with respect thereto, and at the time holds an unrevoked certificate to that effect from the secretary of State.''

The so-called lease is, as stated in 40 C. J. p. 1047:

''A lease to mine oil or gas is a mere incorporeal right to be exercised in the land of another; a profit

*a prendre,* which may be held separate and apart from the land itself; and ordinarily it is a mere option or right to drill and extricate oil or gas if found."

See, also, 18 R. C. L. p. 1210.

The lease or contract is executory, 14A C. J. p. 1305, and is affected by the statute quoted, and is therefore void and unenforceable. *Flint* v. *Le Heup,* 199 Mich. 41. Nor is plaintiff estopped by having accepted certain payments, called rentals. This statute was enacted for the benefit of the general public, and its purpose cannot be bargained away by individuals. *D. M. Osborne & Co.* v. *Shilling,* 74 Kan. 675 (88 Pac. 258, 11 Ann. Cas. 319); 14A C. J. p. 1307.

There being no contract, and hence nothing to rescind, tender as upon rescission is not required. *Rott* v. *Goldman,* 236 Mich. 261.

The attempted assignment of the contract is of no effect; there being nothing to assign.

It follows that decree should be affirmed, with costs.

FEAD, J., concurred with CLARK, C. J.