LEONARD W. GAMMONS v. GUSTAF JOHNSON.

April 26, 1899.

Nos. 11,362—(47).

## Attorney at Law—Offer to Prove Speculative Contract with Attorney's Principal—Error to Refuse Offer—Champerty—Public Policy.

Upon the trial the defendant offered to prove that the plaintiff, an attorney at law, and one H. entered into an agreement or arrangement whereby H. was to canvass certain counties in the state to hunt up claims of landowners against railroad companies for failing to fence their roads across the lands of such parties, and to instigate suits on such claims against the companies; that, for the purpose of working up and instigating such litigation, plaintiff furnished H. blank contracts which he was to procure the parties to execute, by which they severally authorized H. to employ an attorney to bring a suit against the railroad company for damages; H. to prosecute the suit at his own expense, indemnify the party against the expenses of litigation, accept a share of what he recovered for his compensation, and not to charge anything for his services unless he recovered; the party not to settle with the railroad company without H.'s consent. H. canvassed a number of counties, and procured over 70 persons, including defendant, to sign these contracts, upon which, in pursuance of the arrangement between plaintiff and H., the former instituted suits against the railroad companies in the names of the landowners, including the defendant. Both plaintiff and H. were strangers to these parties and to the claims which were the subjects of these contracts, and had no interest in them or any object in intermeddling with the matters, except the speculative one in the pecuniary profit which they might derive from the litigation which they instigated. In an action by plaintiff against the defendant for services rendered and disbursements made by himself and H. in prosecuting the suit in the name of plaintiff, in pursuance of this contract, *held*, that it was error to exclude the evidence; that, upon the facts offered to be proved, plaintiff cannot recover even the reasonable value and amount of these services and disbursements; that this systematic scheme of working up and instigating vexatious litigation in which he and H. were not interested, and to which and the parties they were entire strangers, was champertous and barratrous, and against public policy.

## Same—Quantum Meruit—Gammons v. Johnson Distinguished.

The rule that an attorney may, notwithstanding a champertous contract as to his compensation, recover the reasonable value of his services law-

fully performed, in litigation legitimately instituted, is not applicable. The vice was not merely in the contract for compensation, but in the unlawful and vexatious scheme by which the litigation itself was worked up and instigated.. Distinguishing Gammons v. Johnson, 69 Minn. 488.

Action in the district court for Grant county to recover $90 for services performed and money expended for defendant. The case was tried before C. L. Brown, J., and a jury, which rendered a verdict in favor of plaintiff for $40; and from an order denying a motion for a new trial, defendant appealed. Reversed.

*J. W. Mason,* for appellant.

*F. W. Booth* and *L. W. Gammons,* for respondent.

The contract being void, suit may be maintained on a quantum meruit. 3 Am. & Eng. Enc. 86; Gammons v. Johnson, 69 Minn. 488; King v. Brown, 2 Hill, 485. See also Burlingame v. Burlingame, 7 Cow. 92; Clark v. Davidson, 53 Wis. 317; Lockwood v. Barnes, 3 Hill, 128; Stearns v. Felker, 28 Wis. 594; McPhail v. Board, 119 N. C. 330. The contract is not divisible. Clark v. Davidson, supra. If part of a contract is void under the statute of frauds, the whole is void. Van Alstine v. Wimple, 5 Cow. 162; Lexington v. Clarke, 2 Vent. 223; Baldwin v. Palmer, 10 N. Y. 232. The case stands as if there had been no contract. Acceptance of the fruits of litigation is ratification. Bassford v. Swift, 17 Misc. 149. See U. S. v. School, 56 Neb. 645; Moye v. Cogdell, 69 N. C. 93; Dresser v. Wood, 15 Kan. 344.

MITCHELL, J.

This is the third case, growing out of the same contract between the defendant and one Huber, which has been before this court. Huber v. Johnson, 68 Minn. 74, 70 N. W. 806; Gammons v. Johnson, 69 Minn. 488, 72 N. W. 563.

The provisions of the contract are quite fully stated in the opinion in Huber v. Johnson, supra. That action was brought by Huber himself to recover on the express contract, and this court held that the contract was against public policy and void, and that no recovery could be had upon it.

The second action (69 Minn. 488, 72 N. W. 563) was brought by

the present plaintiff (who is the attorney employed by Huber under the contract already referred to) to recover the reasonable value of professional services rendered for defendant in his suit for damages against the Great Northern Railway Company. The complaint in that case alleged that the defendant, after a fruitless effort to settle and adjust his claim for damages against the railroad company, himself caused suit to be brought in his own name against the railroad company to enforce his claim, and employed the plaintiff to institute and prosecute a suit; that thereafter the plaintiff and defendant entered into a written agreement as to plaintiff's compensation for conducting the suit. This alleged agreement was set out in the complaint in full, and was identical in its terms with the contract with Huber declared on in the first action. It will be observed that there were no allegations in that complaint tending to show anything champertous or against public policy in the institution of the action against the railway company, or in the original employment of the plaintiff by the defendant. The only vice was in the subsequent agreement between the parties as to plaintiff's compensation. When the case came up on appeal from an order sustaining a demurrer to the complaint, it was held that, upon the facts alleged, the plaintiff might recover a reasonable compensation for his services, although the written contract between him and the defendant was void, the court saying, at page 489:

"The performance of the services by the plaintiff for the defendant was valuable, and in no manner prohibited by statute, or void at common law, or as against public policy. In and of themselves the services or benefits rendered were innocent and proper."

Upon the particular facts alleged, this decision is undoubtedly in accordance with the great weight of authority. It was presumably upon it that the learned trial judge chiefly relied in the present case. But, as will be hereafter shown, it does not go to the length the judge probably supposed, and does not control this case.

The complaint in this case is silent as to any special contract between the defendant and either the plaintiff or Huber. For his first and second causes of action, the plaintiff alleges generally the performance of professional services, and the expenditure of money

by the plaintiff for the defendant at his instance and request. For his third and fourth causes of action, he alleges generally the performance of certain labor and services, and the expenditure of certain moneys by Huber for the defendant at his special instance and request, which claims had been assigned by Huber to the plaintiff.

In his answer, the defendant, among other things, denied that he ever employed or requested the plaintiff to perform any services for him, or that plaintiff ever did perform any. The answer further alleged, and upon the trial the defendant offered to prove, that, in the spring of 1896, plaintiff and Huber (who was a layman) entered into an agreement or arrangement whereby Huber and one Mossberg, as the agent of plaintiff and Huber, were to go through certain counties in the northern and western parts of the state to seek out claims, and instigate suits against the Great Northern Railway Company for damages resulting to different parties from the failure of the railroad company to fence its track across the land of such parties, and, when they discovered any such claim, to procure the party having the claim to bring suit against the railroad company; that, for the purpose of working up and procuring the institution of such suits, plaintiff furnished Huber with blank contracts for the parties to execute, which were identical in terms with the contract already referred to between defendant and Huber, of which it was one; that, in pursuance of this agreement, Huber and Mossberg canvassed some nine counties to seek out and bring to light such claims, and induced 71 separate and distinct persons (among others this defendant) to execute such contracts, under which 71 suits were instituted against the railroad company by Huber and plaintiff, but in the names of the parties who had executed the contracts, in all of which the plaintiff appeared as attorney; that in these suits the amount of damages claimed ranged from $400 to $1,500 in each suit, but all of them, except one or two, were settled before trial by the railroad company with the landowners for from one dollar to five dollars each; that none of these parties would have brought these suits but for the systematic work of the plaintiff and Huber to induce them to do so; and that defendant was one of the parties who was thus induced by Huber to sign a contract authorizing the commencement of a suit against the railroad company. The de-

fendant also offered evidence that at least some of these parties did not know that they had any claim against the railroad company, until so informed by Huber.

All of this evidence was excluded on the objection of the plaintiff; and this ruling is the subject of one of the main assignments of error.

It conclusively appears from the evidence that the suit against the railroad company was instituted in the name of the defendant by Huber or plaintiff, or both, under and in pursuance of the written contract, already referred to, between defendant and Huber; that whatever services or expenditures were performed or made by either of them were in the institution and prosecution of that suit in accordance with the terms of that contract; also that plaintiff was never employed by defendant personally, but, if employed by any one, it was by Huber; and that when plaintiff instituted the suit against the railroad company he knew all about the contract between defendant and Huber, and accepted employment, and did whatever he did, upon the strength of it. It also appears that defendant settled with the railroad company for $100 before the suit was tried.

According to the evidence offered and excluded, plaintiff and Huber, who were strangers to the parties and to the claims which were the subject of these contracts, and who had no object in intermeddling with the matters, except a speculative one, entered into a systematic scheme to hunt up claims, or supposed claims, against the Great Northern Railway Company, upon which the original holders would probably never have asserted any right or brought any action, and to stir up wholesale litigation, and induce the landowners to allow them to bring actions, by agreeing to prosecute the suits at their own expense, indemnify these clients against the costs and expenses of litigation, accept for their compensation a share of what might be recovered, and not to charge anything for their services unless they succeeded in collecting the claims, and further attempted to make the contract ironclad by incorporating into it a provision that the clients should not settle with the railroad company without their consent, under the penalty of having to pay them a specified sum, apparently fixed arbitrarily without reference

to the value of their services. A course of conduct on the part of either an attorney or layman more obnoxious than this to public policy, as involving champerty, maintenance, and barratry, cannot be well imagined.

The old common-law rules on the subject of champerty have doubtless been much modified, but the essential principle upon which those rules rested, and the evils and abuses at which they were aimed, still exist. The general purpose of the law against champerty and maintenance and barratry was to prevent officious intermeddlers from stirring up strife and contention by vexatious or speculative litigation, which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law. All contracts or practices which necessarily and manifestly tend to produce these results ought still to be held void on grounds of public policy. It is doubtless the more modern doctrine that the mere taking a case on a contingent fee does not constitute champerty, and that it is not unlawful for an attorney to carry on a suit for another for a share of what may be recovered, at least unless he assumes the risks of litigation by indemnifying his client against all costs and expenses of the same. But the vice in the conduct of these parties lies deeper and much further back than merely entering into a champertous contract for their compensation for lawful services performed in the prosecution of suits legitimately instituted.

According to the facts alleged and offered to be proved, it consisted of an unlawful and barratrous systematic scheme to work up and instigate wholesale vexatious litigation in the names of parties and concerning subjects to whom and which they were entire strangers, and in which they had no interest, except a speculative one in the pecuniary profit which they might derive from the litigation which they had instigated, and which in all probability never would have been instituted except for their officious intermeddling. The illegality of the conduct of the parties enters into the very inception of the scheme by which the litigation itself was instigated, and but for which it would never have existed. Even if the special written contracts regarding compensation be set aside

76 M.—6

or ignored, this original vice, in the very inception of the scheme, would still exist in full force.

To hold that a party can thus illegally stir up and instigate litigation, and yet obtain the benefits of it by ignoring the special contracts, and bringing suit upon a quantum meruit for services performed in prosecuting the litigation which he has unlawfully instigated, would be a travesty on justice, and to permit a party to do indirectly what he cannot do directly. It is unnecessary to consider whether the course of conduct alleged and offered to be proved would be a ground for the disbarment of an attorney. It is, however, so clearly against public policy that the courts ought not to enforce such a contract, or aid a party in recovering the fruits of such a speculative and vicious scheme. If defendant can prove what he alleges in his answer, and what he offered to prove, it would constitute a complete defense to each and all of the causes of action set up in the complaint. It was therefore error for the court to exclude the evidence.

It is suggested by counsel for the plaintiff that defendant's offer was made as a whole, and, therefore, if any part of it was incompetent, the whole was properly excluded. But counsel does not specify what parts, if any, were incompetent, and we discover none, although proof of some of the minor details in the offer may not have been necessary to establish a defense.

At the close of defendant's offer there was added, "Defendant offers to show Mr. Gammons' connection with Mr. Huber in working up these suits." And in his objection to the offer plaintiff objected, "except the last proposition." And his counsel now urges that defendant has no reason to complain of the ruling of the court, because he was still at liberty to prove plaintiff's connection with the conspiracy.

Just what was intended by the exception to the objection to defendant's offer is not clear. The exception would seem to be inconsistent with the objection. It would be impossible to show plaintiff's connection with a conspiracy between him and Huber, without proving the confederation between the two, and Huber's connection with the matter, as well as plaintiff's. The court's ruling was evidently based upon the theory that it was wholly imma-

terial what the original arrangement between plaintiff and Huber was, or how the litigation was instigated; that plaintiff was, in any event, entitled to recover the reasonable value of his services, if it could be shown that he performed them for the defendant, and at his request, express or implied. And the fair inference from the record is that plaintiff's counsel, by this exception contained in his objection, merely referred to anything that would tend to prove that the plaintiff's services were rendered at defendant's request. It is unnecessary to consider any of the other points discussed by counsel.

Order reversed, and a new trial granted.

CANTY, J.

I concur.   The common law has been changed in this state to the extent of allowing an attorney to take a case for a contingent fee, or for a share of the amount recovered, and, in my opinion, it is right that the law should be so changed; otherwise, a poor man might not be able to employ an attorney to vindicate his rights, especially if the case required an attorney of experience and ability whose services command a high price.

But permitting attorneys to share in the proceeds of the litigation tends strongly to abuses of various kinds, and this tendency to abuse should be closely watched by the courts. It is somewhat unprofessional for an attorney to solicit employment at all, more especially so when he expects to take the case "on shares"; and it is still more unprofessional for him to solicit employment in a case which he expects to take "on shares," and which he has good reason to believe would never be brought at all, were it not for his solicitation. But whether an isolated or casual solicitation of employment in a case of this kind is so highly unprofessional that the court would refuse to aid the attorney in recovering remuneration for his services in the case, I need not consider, but the great and crying evil which the courts should condemn most strongly is making a practice of soliciting such cases. An attorney who does this should, in my opinion, be disbarred; and surely he should not be rewarded by being aided to recover remuneration for doing the very act, or one of the series of acts, for which he should be disbarred.

On the plainest principles of public policy, the courts should condemn the practice of the "ambulance chasers" and "prowling assignees" who thus stir up litigation, and should refuse to aid them in recovering fees in such cases.