ELLIS, Respondent, vs. FRAWLEY and another, Appellants.

*January 19—April 24, 1917.*

*Attorneys at law: Stirring up litigation: Contracts: Validity: Public policy: Appeal: Objections not made at trial.*

1. An agreement between a firm of lawyers and another lawyer, pursuant to which the latter went around among the sufferers from a flood and persuaded them to employ the firm to prosecute their damage claims and to assign their claims to one person for the purpose of facilitating the litigation, was against public policy, and the courts will not assist said lawyer to recover anything from the firm for his services in carrying out that agreement, whether such services were rendered before or after the procuring of the assignments.
2. A judgment against the firm for the value of such services must be reversed on appeal even though the objection that the agreement was against public policy was first raised in the appellate court.

APPEAL from a judgment of the circuit court for Eau Claire county: E. RAY STEVENS, Judge. *Reversed.*

Action for an accounting and settlement of the affairs of a joint business venture or partnership. The plaintiff is a lawyer residing and practicing at Black River Falls, the defendants are lawyers residing and practicing at Eau Claire. In October, 1911, a destructive flood occurred in the Black river by which much private and public property was destroyed in the city of Black River Falls. It was claimed generally that the flood resulted from the negligence of the La Crosse Water Power Company in the operation of its dam across said river. The complaint charges that in April, 1912, the plaintiff and defendants made a partnership agreement by which they were to act jointly as attorneys in prosecuting claims for all persons who might employ them to sue for and collect their claims against the Power Company arising out of said flood, and that in pursuance of that agreement the partnership brought suits for a large number of such claimants and performed professional services in such

suits and finally effected a settlement of such claims for a large sum of money, and that the defendants received in payment for such partnership services more than $20,000, of which one half belongs to the plaintiff, but that said defendants refuse to pay the plaintiff any part thereof. The defendants denied the existence of any such partnership. The action was tried by the court without a jury, and the court found that no partnership was formed, but "that plaintiff at the request of the defendants rendered services to the defendants in inducing flood sufferers to retain the defendants to prosecute their claims and in procuring assignments of such claims, that he continued to render services to the defendants during the years 1912 and 1913 with reference to the losses sustained and claims made by such flood sufferers which defendants were seeking to recover through actions brought by them acting as attorneys for such flood sufferers;" also "that said services rendered by the plaintiff to the defendants at their special instance and request are reasonably worth the sum of $975." There is no bill of exceptions. The defendants appeal from judgment against them in accordance with the findings.

For the appellants there was a brief by *W. H. & T. F. Frawley,* in person, and *Bundy & Wilcox* and *Sturdevant & Farr,* all of Eau Claire, of counsel, and oral argument by *C. T. Bundy.*

For the respondent a brief by *R. J. MacBride* of Neillsville was submitted by *L. Olson Ellis, in pro. per.*

The following opinion was filed February 13, 1917:

WINSLOW, C. J. There being no bill of exceptions, the only inquiry presented is whether upon the facts found by the trial court the judgment is right. Those facts are: A firm of lawyers requested another lawyer to go around among the flood sufferers and persuade them to employ the firm to prosecute their damage claims and to execute assignments of

their claims to one person for the purpose of facilitating the litigation; the second lawyer undertook the task, was successful in his work, and has recovered the value thereof. The judgment is right unless the arrangement between the parties was against public policy. If it was, the judgment is wrong and must be reversed even though the objection be now made for the first time. *Jacobson v. Bentzler,* 127 Wis. 566, 107 N. W. 7. The court will not allow itself to be used as the means of carrying into effect a contract which is essentially contrary to morality or to public policy even though no objection be made by the parties. *Wight v. Rindskopf,* 43 Wis. 344. It seems that the arrangement was clearly against public policy.

The mere intermeddler, the officious stirrer up of litigation in which he has no interest save the possibility of a commission or a fee, has been condemned by courts and legislators since the earliest times. This is so because the practice of the law is not a trade but a ministry.

Chief Justice RYAN well said in his eloquent address before the graduating law class of the University of Wisconsin for 1873:

"The pursuit of the legal profession for the mere wages of life is a mistake alike of the means and the end. It is a total failure of appreciation of the character of the profession. This is the true ambition of a lawyer: To obey God in the service of society; to fulfil His law in the order of society; to promote His order in the subordination of society to its own law, adopted under His authority; to minister to His justice, by the nearest approach to it, under the municipal law, which human intelligence and conscience can accomplish. To serve man, by diligent study and true counsel of the municipal law; to aid in solving the questions and guiding the business of society, according to the law; to fulfil his allotted part in protecting society and its members against wrong, in enforcing all rights and redressing all wrongs; and to answer, before God and man, according to the scope of his

office and duty for the true and just administration of the municipal law."

The ideal here expressed is high, it is by no means always lived up to, but it is none the less the ideal towards which the profession should ever strive. It is because the ideal is frequently lost sight of, because many lawyers practice their profession as if it were a mere business like the buying and selling of groceries, that the profession falls into disrepute. The great Chief Justice died before the evolution of the personal injury action and that degraded form of lawyer commonly known as the "ambulance chaser." What he would have said of them can better be imagined than described.

The twenty-eighth canon of ethics adopted by the American Bar Association treats the subject as follows:

"*Stirring up Litigation, Directly or Through Agents:* It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship, or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit, or breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases into his office. . . . A duty to the public and to the profession devolves upon every member of the bar, having knowledge of such practices upon the part of any practitioner, immediately to inform thereof to the end that the offender may be disbarred."

This court in the past has taken an elevated view of the duties of an attorney in the practice of his profession, and we have no inclination to take any less elevated view now. *Wight v. Rindskopf, supra.* The standard should be raised rather than lowered, for the age in which we live is one which is much concerned with money and the things which money

will bring. The fact that the lawyer must support himself by his professional labors and that he receives his compensation from a purely private source unquestionably has a tendency to commercialize his work and obscure even from his own mind the fact that his real client is Justice. To successfully combat this tendency we must have lawyers who not only say but really believe that they *are* ministers of justice and not men hired by their clients to circumvent or outwit the law. We cannot have such lawyers if such contracts as this are to be approved.

It is stated in respondent's brief that the claims secured by the aid of the plaintiff were all assigned to one person, that one action was commenced thereon, but that before trial a settlement was made for a sum somewhere between fifty and sixty thousand dollars, out of which the defendants, by virtue of their contracts with the claimants, retained forty per cent. or about $22,000. These facts are not in evidence, but they may properly be assumed as true as against the party who asserts them. This, then, was the scheme to the consummation of which the plaintiff agreed to contribute, *i. e.* a scheme to get hold of all the claims possible and in case of success *forty* per cent. of the proceeds was to go to the lawyers and sixty per cent. (probably after payment of costs) to the people whose property had been swept away.

Attorneys are entitled to good pay, for their work is hard, but they are not entitled to fly the black flag of piracy. Such contracts as are here in question tend to make the lawyer forget his high duty as a minister of justice and to convert him into a mere grubber for money in the muck-heaps of the world. They also tend to make the name of lawyer a proverb and a byword among laymen.

A number of courts have condemned contracts of this nature. 2 Thornton, Attorneys, § 436; *Gammons v. Johnson,* 76 Minn. 76, 78 N. W. 1037; *Holland v. Sheehan,* 108 Minn. 362, 122 N. W. 1; *Ingersoll v. Coal Creek C. Co.* 117 Tenn.

263, 98 S. W. 178; *Meguire v. Corwine,* 101 U. S. 108; *Ford v. Munroe* (Tex. Civ. App.) 144 S. W. 349.

In most of the cases cited the party soliciting the business was a layman, but it is not perceived how this fact affects the principle involved.   If it is against public policy for a layman to foment litigation and make a claim bureau of himself under contract with a law firm, it would seem to be fully as much so for a lawyer to do the same thing.

The contract being against public policy, the courts will affirmatively assist neither party, but will leave them where it finds them.

The question has suggested itself whether the plaintiff might not be entitled to recover the value of the services which the finding states he rendered after the procuring of the assignments, on the ground that these later services were independent of the original contract and not affected by its invalidity.   On reflection, however, we do not see how they can be separated.   Whatever the original agreement was, whether an agreement of partnership as stated in the complaint, or an agreement of hiring as found by the court, it is clear that the respondent's position has been and now is that all his services were rendered in the carrying out of that agreement.

*By the Court.*—Judgment reversed, and action remanded with directions to render judgment dismissing the complaint on the merits.

VINJE, J., took no part.

A motion for a rehearing was denied, with $25 costs, on April 24, 1917.