KANE v. SESAC, Inc. (BREGOFF et al., Third-Party Defendants).

District Court, S. D. New York.

Nov. 15, 1943.

855

856

Weinberger & Wayne, and Harry Weinberger, all of New York City, for plaintiff.

Holm, Whitlock & Scarff, and Victor E. Whitlock, all of New York City, for Sesac, Inc.

Louis A. Russo, of New York City, for Federation Bank & Trust Co., third-party defendant.

Charles Winkelman, of New York City, for Charles D. Roth, trustee in bankruptcy of Abner J. Rubien.

Isidor Bregoff, in pro. per., and Frederick W. Scholem, both of New York City, for Isidor Bregoff.

JAMES ALGER FEE, District Judge.

The facts which give rise to this litigation are labyrinthian. As succinct a statement thereof as possible will be given in the following paragraphs.

Thomas F. Kane, plaintiff, who has been an author's representative and who, the record shows, is a money lender, has been an associate and client of Abner J. Rubien since 1925. He loaned money to Rubien at all periods in substantial amounts. Abner J. Rubien and Isidor Bregoff became partners in the legal firm of Rubien & Bregoff in New York City in 1929. One of the assets of the firm was a contract, dated April 7, 1933, with Sesac (at that time known as Society of European Stage Authors and Composers, Inc.).

The business of Sesac consisted of supervising the musical compositions of composers and songs of authors from foreign countries and exacting license fees for the right to use the music and songs so listed. Under the contract, which was to run for ten years, Rubien & Bregoff were to receive one-third of the gross intake, including license fees and recoveries, in consideration of the firm prosecuting such suits and taking other action to establish the right of Sesac to levy such exactions. Rubien & Bregoff prosecuted suits against National Broadcasting Company and various of its affiliated stations, which suits were settled early in 1934 by the entry of a licensing agreement with Sesac at a gradually increasing fee which started at $25,000 a year. At this period, Kane was a client of Rubien & Bregoff, and also made various loans to that partnership in substantial amounts.

Rubien & Bregoff was dissolved April 7, 1934, and a special contract of dissolution entered two days later with respect to the employment contract with Sesac, above mentioned, which provided that Bregoff was to receive a specified compensation for five years. There is no question but that this was paid in full.

Rubien entered another retainer agreement with Sesac April 7, 1934, whereby he agreed to act as attorney, to prosecute and defend all necessary suits and to obtain new licensing agreements for Sesac, all

at his own expense. It was necessary in obtaining such licensing agreements with hotels, theatres, orchestras, radio stations and others, to employ traveling agents, solicitors and lawyers.

Kane remained as a client and financial backer of Rubien. On February 25, 1935, an agreement was entered whereby Kane was to advance moneys to Rubien to enable the latter to finance and perform the Sesac contract. In 1937 there was nearly $40,-000 owing from Rubien to Kane, in addition, it is claimed, to $7,500 due from Rubien to Mrs. Kane, as a result of these operations. While this money was still owing, Rubien negotiated another contract with Sesac, which was executed on similar lines to the previous agreements, on April 7, 1939.

On November 25, 1939, Bregoff's attorney wrote a letter to Rubien threatening suit on the affairs of the former, and failing to get satisfaction, commenced suit December 18, 1939.

The basic agreement between Kane and Rubien, dated November 27, 1939, provided that Rubien should pay Kane $750 per month; that all moneys coming into possession of Rubien should be impressed with a trust; that a checking account should be opened in their joint names in Putnam Trust Company, Greenwich, Connecticut, in which all money received by Rubien was to be deposited to be withdrawn upon the joint signatures. Kane was to receive the amounts above indicated and Rubien the balance. This document further provided that Rubien was to execute to Kane an assignment of all his rights in the Sesac contracts. Kane thereby agreed to hold the assignment and not to give Sesac notice thereof until Rubien had defaulted in his obligations due Kane under the agreement.

Kane received from Rubien on November 27, 1939, a document which is referred to as an "assignment" of the burden and benefit of the contract. This document was never signed.

Subsequently, Rubien executed a second "assignment", but this time only purported to convey the proceeds or profits of the Sesac contract upon breach of the agreement between Kane and Rubien whereby the latter agreed to make certain payments to the former. No notice was presently given to Sesac of this transaction and pay-

ments continued to be made on the retainer agreement to Rubien. It was also kept secret from Bregoff and other creditors.

Bregoff commenced suit against Rubien in the New York Supreme Court, alleging that Rubien had misrepresented the type of personal retainer which he was to receive from Sesac and, also, that Rubien had failed to account for moneys which the latter was obligated to pay Bregoff under the general agreement dissolving the firm of Rubien & Bregoff. Rubien defended. There were several unsuccessful appeals to the Appellate Division. The cause came on for trial. In open court on the 19th day of June, 1940, Rubien agreed to settle by paying Bregoff $7,500 within six months and gave promissory notes therefor, which the latter agreed to accept. At that time Rubien threatened to file a petition in bankruptcy if the matter were pressed. Bregoff was relieved of the settlement agreement by court order which was appealed by Rubien, but affirmed. The cause was then heard and an interlocutory judgment entered May 5, 1941, for Bregoff and against Rubien, directing an accounting.

From its date forward, the payments under the Sesac contract had been made to Rubien who had regularly deposited these in the Kane-Rubien joint bank account. During this period Kane received $19,-273.67 and Rubien $5,518.06 through the medium of the secret account.

The Federation Bank and Trust Company, a creditor of Rubien, obtained judgment against him in the New York City Court July 23, 1941, and early in August commenced a supplementary proceeding for the examination of Sesac as a third party, by service of a subpoena pursuant to Section 775, subdivision 2, of the Civil Practice Act of New York and, subsequently, made application for an order directing Sesac to pay over the fund of $1,000 here in controversy to the bank.

In August 1941, Rubien defaulted in the payments which he was to make in accordance with the terms of his agreement with Kane. On August 25, 1941, Kane thereupon filed his assignment with Sesac and requested the latter to make all future payments to him. No further payments were made by Sesac to Rubien or Kane. The payment due August 1st became the subject of other litigation. Rubien, about this time, left New York and went to Chicago.

Sesac brought the motion, in the suit of the Bank, to the attention of the legal firm representing Kane. On return of the motion, the Bank's attorney and Kane's attorney appeared in court and consented to the entry of an order referring the question of title to the official Referee and a memorandum decision was rendered thereon. Bregoff attempted to intervene in this proceeding. Whereupon, since Kane's attorney would not consent, a clause reciting Kane's appearance was stricken from the proposed order and he, thereafter, does not appear in the course of the proceedings. Bregoff intervened.

Thereafter, Sesac deposited $1,000, being the amount due Rubien August 1, 1941, and upon proceedings before a Referee this amount was paid, $750 to the Bank and $250 to Bregoff.

Bregoff pursued his interlocutory judgment and on March 18, 1942, obtained a final judgment for $94,997.95 against Rubien, who had not further defended the action. On April 1, 1942, Rubien filed a petition for voluntary bankruptcy. The adjudication thereon followed on April 2d.

In June, 1942, Kane commenced this action against Sesac to obtain $8,200 claimed to be due Rubien under the original contract of April 1, 1939, and assigned to Kane. Sesac brought $7,200 into court and impleaded the other defendants. Bregoff counterclaimed against Kane for $25,000 for alleged fraud and misrepresentation.

Many controversies were originally raised, but they are now in general reduced to three. These will now be outlined.

(a) There is a controversy as to the ownership and right to a fund of $7,200 deposited by Sesac. Kane claims under his contract and assignment. Sesac asserts no claim. Bregoff and the Federation Bank and Trust Company have been each enjoined by the United States District Court for the District of Illinois from making any claim thereto. Roth, Trustee in Bankruptcy for Rubien, is claiming the whole fund.

(b) Another controversy arises over a fund of $1,000 deposited by Sesac in the action in the City Court and divided between the Bank and Bregoff. Kane claims a judgment against Sesac for this. Sesac resists, but claims a right to a judgment against the Bank and Bregoff, if the matter is held otherwise.

(c) Bregoff claims $25,000 damages against Kane. No other party is interested in this controversy.

At the outset it must be remarked that these controversies may be determined upon strictly legal grounds. Except for the Trustee in Bankruptcy, none of the claimants holds a strong moral or equitable position. A mad catch-as catch-can struggle for the proceeds of a pressure business involved each of the other contestants.

The pirating of music of helpless composers and of the songs of unrepresented authors has been an evil, but has been practiced with considerable commercial success and with little regard for law or ethics. As a result, this protective entity has been built up to combat such practices and use the beneficent provisions of the copyright law and legal doctrines relating to literary property for that end. But evil begets evil.

In order to meet pirating, a corporation with monopolistic control over a series of such productions farms out its tremendous power to a lawyer chosen by it, who prosecutes actions in its name, who obtains payment for licenses covering such productions, who hires other lawyers, lay agents and business representatives, who is recompensed by a percentage of the intake including recoveries in court, who agrees to pay and bear any and all legal and administrative expenses [1] and who, in order to permit him to carry out the obligations of his engagement, is financed by a layman and the latter is paid his advances and, in addition, is paid a percentage of all the compensation of the lawyer,[2] under the contract.

 No comment or holding upon these features is necessary except insofar as it throws light upon the dealings of the actors in the instant controversy. Obviously, Sesac desired to and expressly did pro-

---

[1] In re Speranza, 186 N.Y. 280, 284, 78 N.E. 1070; see Note 6, A.L.R. 184, Validity of agreement by attorney to save client harmless from costs and expenses.

[2] For situations which may be somewhat illuminating, although it is not intended to indicate that the facts are similar, see Matter of Co-operative Law Co., 198 N.Y. 479, 484, 92 N.E. 15, 32 L.R.A.,N.S., 55, 139 Am.St.Rep. 839, 19 Ann.Cas. 879; In re Wellington's Estate, 154 Misc. 271, 276 N.Y.S. 946; In re Lynch's Estate, 154 Misc. 260, 276 N.Y.S. 939.

tect its relation with Rubien from publicity and gave no sanction to his efforts to introduce an outside party into the mutual dealings and relationship. The engagement was for personal and confidential services. The whole contract could not be assigned upon familiar principles. It was a breach of contract to attempt to assign the contract or its proceeds.

The furnishing of money by a layman for the purpose of permitting a lawyer to provide, in part, costs and expenses in carrying on litigation for a third party and, in part, expenses for an organization to threaten litigation and compel the taking of licenses, constituted maintenance. All the reasons which impelled the justices of the common law to punish powerful barons and large landholders for maintaining actions against others by furnishing costs and expenses, are present here.[3] The debt from Rubien to Kane had its origin in maintenance; apparently. The original contract between Sesac and Rubien was champertous. Even if it is assumed that Sesac did not know that Kane was furnishing the money to Rubien to pay the costs and expenses, still the agreement between Kane and Rubien to divide the fees of the latter as a lawyer, was champertous[4] and void. Although the money advanced is now set up as a debt, this contract shows that these constituted investments to be paid by a share of the fees.

Rubien and Kane then entered the second agreement above outlined, whereby Rubien was still to carry on the Sesac contract, and the secret bank account was established and the "assignments" of the contract or its benefits were made. These contracts or assignments were also affected by the champertous nature of the original arrangement. None could have been enforced, therefore, against Rubien and each is also unenforceable against his Trustee in Bankruptcy.[5]

Even if the so-called assignments were not subject to this defect, there is still another ground upon which they may be attacked. One creditor, it is true, could in good faith, prior to the four months penumbra of bankruptcy, accept a conveyance of property for a pre-existing debt, but the evidence clearly shows that Rubien was attempting by these documents to hinder, delay and defraud other creditors, and notably Bregoff, and further that he was then insolvent. Kane had notice and knowledge of each of these factors. Thereupon, in order to effect this specific purpose and to assure Kane that a share of the proceeds of the Sesac contract would come to him, the secret joint bank account was set up in a neighboring jurisdiction, safe from prying creditors, wherein Rubien had full protection for all money necessary to maintain litigation for Sesac and all he wished to spend, so long as Kane received his monthly allotment in payment of the debt resulting from money advanced for the performance of the champertous contract between Sesac and Rubien. The mere statement of this scheme suffices to brand the so-called assignments which were integral parts thereof, as voidable when properly attacked by creditors.

The debtor in failing circumstances is still the owner of his property and his general creditors have no interest therein. He has, therefore, complete power of honest disposal. His sale of part thereof cannot be questioned even if the price may appear inadequate. On similar principles, a pledge, mortgage or assignment for security of a portion of his assets cannot be subsequently attacked upon the sole ground that one creditor has received preferential treatment, unless bankruptcy intervene within the statutory period. The transferee may have knowledge of the intent to prefer him. Neither the fact that an antecedent debt is used as a consideration[6] nor the fact that a confidential relation exists between the grantor and grantee is sufficient to indicate a flaw in such a transfer.

But it is possible for a preferential transfer to be made a vehicle of fraud. The criterion is the intention of the grantor.[7] If he makes a preferential transfer with the intention to hinder, delay and defraud a creditor, or all of his

---

[3] Mud Valley Oil & Gas Company v. Hitchcock, 40 Ind.App. 105, 109, 110, 81 N.E. 111.

[4] Gammons v. Johnson, 76 Minn. 76, 81, 78 N.W. 1035.

[5] In re Martin's Estate, 178 Misc. 43, 33 N.Y.S.2d 81, 83; Mandelbaum v. Gilbert & Barker Mfg. Co., 160 Misc. 656, 290 N.Y.S. 462.

[6] Debtor and Creditor Law, Section 272, New York Consolidated Laws, c. 12.

[7] Enthoven v. Enthoven, 167 Misc. 686, 4 N.Y.S.2d 514, 519.

creditors, the transaction is voidable, even though valuable consideration has been paid. Present this element of fraudulent intent on the part of the grantor, the grantee will be subject to proper attack if the value of the estate of the grantor is diminished and the grantee knew of the purpose of the grantor, or at least knew enough facts to put him on his guard. If this is true, the moving purpose of the grantee may be merely to obtain payment of an antecedent debt, or secure a good bargain, but knowledge of the fraudulent intent of the grantor will taint the whole transaction. If such transactions are in the open and above board, the law implies honesty of purpose, but secrecy in such a transaction is universally denounced where there is any advantage reserved to the debtor, however inconsiderable in value it may be. No account is taken of the consideration under such circumstances. As a matter of law, where there is a secret trust, the transaction is a fraud, notwithstanding that it may be shown that both parties were honest in their purposes. Such a reservation of benefit vitiates the entire transaction. The part which is based on consideration is swept aside, as well as that which relates to the benefit of the grantor.

■ These principles relate as well to assignments of contracts for personal services as to other transfers. Two early cases apply these doctrines in assignments of payments for personal services. It was held in each that an assignment of unearned wages in consideration of an antecedent debt and future advances, where the assignee secretly returned the surplus over stated sums each month to the debtor was a transaction voidable against creditors.[8] A subsequent case[9] in the same jurisdiction citing these opinions broadly lays down the doctrine that a secret reservation for the benefit of a transferor vitiates the entire transfer whether the interest claimed was of great or small value and irrespective of actual intention. An analogous situation to the case at bar

may be found where a husband secretly transferred to a wife property by deed, while he retained possession, with the understanding that she could place the deeds of record when it became convenient.[10] Lukins v. Aird[11] is the leading case and states the doctrine without qualification.

■ The law of New York has been conveniently stated by a distinguished jurist,[12] as follows:

"Under the law of New York a transfer of property as security which reserves to the transferor the right to dispose of the same, or to apply the proceeds thereof, for his own uses, is, as to creditors, fraudulent in law and void. This is true whether the right of disposition for the transferor's use be reserved in the instrument or by agreement in pais, oral or written; whether the right of disposition reserved be unlimited in time or be expressly terminable by the happening of an event; whether the transfer cover all the property of the debtor or only a part; whether the right of disposition extends to all the property transferred or only to a part thereof; and whether the instrument of transfer be recorded or not."

Judge Goddard, an able judge of this court, has held that this rule still subsists with all its force in New York.[13] In the case there before the court a corporation which was indebted to a second corporation which was also landlord of the first, made an assignment of its book accounts as security for the debts owed by the former to the latter. The arrangement was that the tenant was to have the use of all moneys necessary to allow it to continue to operate its business and that the balance should all be paid to the landlord. The tenant collected considerable amounts of money on the book accounts and deposited the proceeds in its account. From this account checks were drawn, countersigned by an agent and an officer of the landlord and tenant, respectively, with the full knowledge of the landlord and assignee. This money was used in the business of the debtor. It was held that the assignment

---

[8] Lennon v. Parker, 22 R.I. 43, 46 A. 44; see Robinson v. McKenna, 21 R.I. 117, 42 A. 510, 79 Am.St.Rep. 793.

[9] Bellini v. Neas, 50 R.I. 283, 287, 146 A. 634, 636, 68 A.L.R. 303, "The legal principle has been established generally that an absolute conveyance of attachable property with a secret reservation for the benefit of vendor is fraud."

[10] McConnell v. Hopkins, 86 Ark. 225, 110 S.W. 1039.

[11] 6 Wall. 78, 73 U.S. 78, 18 L.Ed. 750.

[12] Mr. Justice Brandeis, in Benedict v. Ratner, 268 U.S. 353, 360, 45 S.Ct. 566, 568, 69 L.Ed. 991.

[13] Thole v. Delmonico Garage, Inc., D. C., 47 F.Supp. 601.

would have been sustained and would have justified the payments made according to its terms after bankruptcy to the assignee, if it had not been for the secret advantage to the assignor. However, it was held that in view of this vitiating feature such an assignment, even based upon consideration, was voidable against the trustee.

If, then, the first controversy relating to the fund of $7,200 be considered, it will be found that Sesac has cleared its skirts by depositing the fund in court, free from claims, and impleading the other defendants. As to the claimant Kane an affirmative case must be made out before participation. Kane could only recover by virtue of the so-called assignments. As has been noted, they are ineffective, and Kane must be denied any right to this fund. Bregoff and the Bank have been denied any right to participate in this fund by the bankruptcy court. Since the Trustee may act for all the creditors and is here urging a claim against the fund, this direction is logical. The Trustee, by a process of elimination, thus prevails, but such determination by chance need not be given play, since the Trustee has affirmatively shown a right to the fund which has never been actually in possession of anyone except Sesac. The latter yields all claim thereto. Rubien earned this sum and the claim for it and the right to the moneys when deposited in court belonged to him. This right passed to the Trustee. It could only have been destroyed by a valid conveyance binding on everyone. The Trustee likewise stands in the shoes of a creditor with an execution returned unsatisfied as of April 1, 1942. If the affirmative lay upon the Trustee, he has established that the assignments were at least avoidable as to him.

The Trustee in Bankruptcy is awarded this fund.

The controversy relating to the $1,000 fund will next be noticed. Sesac could not have been required to pay this money to any assignee of Rubien, since an assignment was a breach of the contract. The confidential, personal relation was of the essence. Further, since the contract between Kane and Rubien was illegal and the so-called assignments were a part there-

of, Kane could enforce them neither against Rubien nor Sesac. Finally, when the fund was brought into court and Kane was notified and made appearance therein, Sesac had performed any obligation which it had to him.

No recovery is allowed Kane against Sesac.

The final controversy arises on the claim of Bregoff against Kane. This sounds in tort. Analysis of the situation will show that no other basis is possible. Bregoff cannot pursue the fund in court, since he is judicially restrained from so doing. The Trustee in Bankruptcy has appeared and must be held to have elected to pursue the remedies against all the other parties.[14] His right is paramount if he so elects.[15] Therefore, Bregoff is not in a position to pursue particular assets.[16] His specific claim is based upon the tort alleged to have been committed by wilfully false representations to Bregoff as to the possession of assets by Rubien and the active participation in the fraudulent concealment thereof by Kane.

In order to prevail, Bregoff must show a duty from Kane to himself and a violation thereof.

Where a debtor has creditors, none of whom is in possession of a judgment against him, he may transfer property or money to one of them in payment of a pre-existing debt and neither the debtor nor the preferred creditor commits any wrong to the other creditors. Yet, if within four months time thereafter, the debtor is adjudicated a bankrupt, the transfer may be set aside.

To carry this further at common law, if a debtor has several general creditors, none of whom has a judgment and, with the specific intent to hinder, delay or defraud one or all of the others, transfers money or property to one of the number, the transaction is valid as to the participants and as to everyone else, with a single, well-defined exception. The reason for this is that where no creditor has a judgment against the debtor, each stands upon the same footing as to his property and none has a lien upon or interest therein. The exception is that if

---

14 Connell v. Walker, 291 U.S. 1, 54 S. Ct. 257, 78 L.Ed. 613.

15 §§ 67, sub. d, 70, sub. a(4), and 70, sub. e of the Acts relating to Bankruptcies, 11 U.S.C.A. §§ 107, sub. d, 110, sub. a(4) and 110, sub. e.

16 Glenny v. Langdon, 98 U.S. 20, 25 L.Ed. 43, construing former acts.

one of the creditors, or all of them, obtain judgment, the conveyance may be set aside as fraudulent. But if the attack is not made with the peculiar weapons so afforded, it is still valid as to all the world. The grantee, therefore, owes no duty to other creditors, up to that point, not to accept the transfer.[17] He has only the obligation to account and pay over in the event he is attacked by the peculiar processes after judgment.

If a duty were recognized at common law before any creditor had judgment, then the fraudulent conveyance would be a separate and distinct wrong to each creditor. Any assessment of damages in such a situation would have to take account of the chances of a particular creditor obtaining satisfaction of his claim in a race with the others. In the last analysis, a creditor is only entitled to have his claim paid. If a duty to each were recognized, a transferee of a small amount of property might be penalized by being required to pay each of the outstanding creditors in full. The policy of the law, therefore, is to limit the duty to returning the property so transferred to those who are diligent or to all the creditors, under proper circumstances.

The nature of the situation is entirely different at common law, where one of the creditors has a judgment with an unsatisfied execution. If a transfer, fraudulent in its nature, is then attempted, a potential lien of the creditors has been frustrated and an actionable wrong committed by the fraudulent grantor and the fraudulent grantee.[18] By a transfer to one creditor, where no other creditor has a judgment with an unsatisfied execution, even though the express purpose be to avoid recovery by one or all of them, no actionable wrong is committed.[19]

It is conceived from the reasons placed at the basis thereof that the doctrine that no tort claim lies under such circumstances has not been changed by the modern tendency toward universal joinder of claims. It still is essential for a general creditor to have made some move against his debtor before he can be conceived to have any lienable interest in property of the latter. Perhaps initiation of a suit may be held sufficient. It is probable that a judgment or issuance of attachment will still be held essential. In any event, the provisions of law permitting maintenance of an action to set aside a fraudulent conveyance without possession of a judgment are held to be adjective in nature. It is expressly so held by the New York Court of Appeals, construing a statute embodying the terms of the Uniform Fraudulent Conveyances Act.[20] The Federal Rules, which give such a right of joinder,[21] expressly deal with procedure and will be so construed,[22] of course. The denial of a claim in tort to a general creditor is substantive in nature.

Although Bregoff might have had this conveyance set aside by virtue of his judgment and execution, he has no actionable right against Kane. The claim, therefore, will be dismissed.

Findings and judgment on all points may be submitted.

[17] See Adler v. Fenton, 24 How. 407, 65 U.S. 407, 412, 16 L.Ed. 696.

[18] See Findlay v. McAllister, 113 U.S. 104, 5 S.Ct. 401, 28 L.Ed. 930.

[19] Glenn Fraudulent Conveyances, Rev. Ed. § 74. The law of New York has been at times clouded upon the point. (Note to Field v. Siegel, 47 L.R.A. 433, 436, citing Hoefler v. Hoefler, 21 App.Div. 633, 47 N.Y.S. 1138, no opinion), but it is fair to assume that the New York courts will follow the current precedents. Kaspin v. Thaw, 262 App.Div. 861, 28 N.Y.S.2d 461.

See Ward v. Petrie, 157 N.Y. 301, 51 N.E. 1002, 68 Am.St.Rep. 790; Carson v. Federal Reserve Bank, 254 N.Y. 218, 172 N. E. 475, 70 A.L.R. 435. This court, of course, must follow the decisions of even the lower courts of New York.

[20] American Surety Company of New York v. Conner, 251 N.Y. 1, 166 N.E. 783, 65 A.L.R. 244.

[21] Rule 18(b), 28 U.S.C.A. following section 723c.

[22] Iroquois Oil & Gas Co. v. Hollingsworth, D.C., 1 F.R.D. 201.