**Frederick NORMAN, D. D. S., P. C. Employee Pension Fund, Plaintiff,**

v.

**ARCS EQUITIES CORP. et al., Defendants.**

**No. 75 Civ. 4391.**

United States District Court, S. D. New York.

July 2, 1976.

which standards appear quite unsettled. *See* 520 F.2d at 268 & nn. 10, 11.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

The Court's Memorandum and Order dated June 7, 1976 is withdrawn on reargument, and corrected and reissued as follows:

By its complaint filed September 8, 1975, plaintiff "The Frederick Norman D.D.S., P.C., Employee Pension Fund," seeks to maintain a class action against Arcs Equities Corp. and others to recover money damages for the benefit of "all persons other than defendants who tendered common shares of Arcs Equities Corp. ("Arcs") to Arcs pursuant to an Offer to Purchase for $10.00 net per share made on or about July 25, 1975."

Arcs tendered for its shares, and plaintiff, in response to the tender offer, sold for $10.00 per share, 500 shares of Arcs which had cost somewhat less. Although a small profit was realized, it contends that the shares were worth $30.00 to $40.00 per share and accordingly, plaintiff had lost profits or damages amounting to between $10,000.00 and $15,000.00.

The complaint is founded upon violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, and § 14(e) of the Act, 15 U.S.C. § 78n(e), as well as common law principles. That the complaint states a good claim is not disputed, and the claimed omissions in the 94 page tender offer document need not be summarized for our present purposes.

Dr. Frederick Norman is a dentist, and the sole shareholder of a New York professional corporation known as "Frederick Norman, D.D.S., P.C.," through which he conducts his professional practice. This corporation employs Dr. Norman, his wife, a dental assistant and a secretary. Its pension trust, as of October 1, 1975, had assets of approximately $55,000.00, about 90% of which is earmarked for Dr. Norman's own pension upon retirement.

Class certification is sought pursuant to Rule 23(b)(2), F.R.Civ.P. The Court would regard the case an appropriate one for declaring a class, except that the totality of circumstances present in this litigation, compels a finding that the representative party, and Dr. Norman, who controls that party, will not fairly and adequately

protect the interests of the class as required by Rule 23(a)(4).

Although Dr. Norman initially testified on deposition that he was the sole trustee of the pension fund, it appeared from his later testimony that his wife is a co-trustee. For many purposes, the pension trust may be regarded as an *alter ego* of Dr. Norman, who will be entitled to 90% of its fruits upon his retirement, and as President and sole shareholder of the P.C. has the power to terminate the employment of the others. However, Dr. Norman may not for purposes of this motion, "pierce the corporate veil" of the pension fund trust, or treat its assets and claims as his own.

Apparently Dr. Norman concedes that the cost of this litigation, to which he has attributed the unrealistically low estimate of $1,300.00 for notification and legal fees, will have to be paid, not by plaintiff, but by Dr. Norman, or the professional corporation of which he is the sole shareholder, acting as a volunteer. He is correct in his conclusion that the expenses of this litigation, no matter how onerous they may become, should not be paid by the trust from its own assets. To do so would be an inappropriate diversion of trust assets for the benefit of class members who are not beneficially interested in the trust. Strict federal regulations affect the administration of pension plans and impose strict fiduciary responsibilities upon trustees of such plans. All fiduciary duties with respect to such a plan must be discharged:

> "solely in the interest of the participants and beneficiaries and—
> (A) for the exclusive purpose of:
>> (i) providing benefits to participants and their beneficiaries; and
>> (ii) defraying reasonable expenses of administering the plan." [29 U.S.C. § 1104(a)(1)].

The maintenance of litigation for the gratification of an animus (see *infra*, pp. 505–506), or for the aggrandizement of persons other than the trust itself who tendered stock of Arcs would not seem to be within this restricted scope. Also, read literally, § 1106(a)(1)(C) of Title 29 prohibits the "furnishing of goods, services or facilities *between* the plan and a party in interest." Dr. Norman and his P.C. are each a party in interest in the Plan, and his expressed intention to pay the legal expenses of the Plan to pursue this lawsuit would violate that provision.

We are reluctant to permit a plaintiff to conduct litigation as a class representative, on the understanding that a related party will voluntarily pay the litigation expenses from time to time as they become due. In the first place, it smacks of Maintenance for a non-party to a lawsuit to pay these legal fees and expenses, which the Court believes amount to much more than the $1,300.00 estimate made by Dr. Norman on his deposition. To permit this goes against all of the traditions of our jurisprudence.

Maintenance remains offensive to us. As said in *Kane v. Sesac, Inc.*, 54 F.Supp. 853, 859 (S.D.N.Y.1943):

> "The furnishing of money by a layman for the purpose of permitting a lawyer to provide, in part, costs and expenses in carrying on litigation for a third party and, in part, expenses for an organization to threaten litigation . . . constituted maintenance. All the reasons which impelled the justices of the common law to punish powerful barons and large landholders for maintaining actions against others by furnishing costs and expenses, are present here [footnote omitted]."

Similarly, discussing the related act of champerty, see *J B P Holding Corporation v. United States*, 166 F.Supp. 324, 327 (S.D.N.Y.1958):

> "The historical objection to this behavior was grounded in the belief that this offense permitted intermeddlers to stir up strife by speculative litigation. The law which evolved was designed to curb this behavior."

In exercising its discretion to certify that litigation proceed as a class action, this Court will take care to avoid giving rise to maintenance or champerty.

Although Norman is the sole shareholder of the professional corporation, perhaps it is

unauthorized for that organization to be paying legal fees for another entity, not in discharge of its own corporate purposes.

There are more reasons to reject this plaintiff as a class representative. Although Dr. Norman had spoken to them by telephone to authorize the suit, he had never met his attorneys in this action face to face until March 9, 1976, some six months after it was filed. At that time he appeared for the first deposition. He testified (March 30, 1976, p. 27) that he had not discussed the institution of the action with any other attorney before it was filed; that one "R" a stockbroker, knowing of Dr. Norman's desire to litigate, telephoned Dr. Norman's dental office and gave the nurse a message asking Norman to call the office of the attorneys of record in this action, and to contact a named person in that office, who would bring the lawsuit.

Dr. Norman testified that he did not know "R", did not even know what his first name was, and had never spoken to him before or since the message; never had any communication with him whatsoever, and never found out who had told "R" to call him. This is the substance of Dr. Norman's testimony, although here, as in many places in his deposition, his formulation of answers seems to the Court somewhat evasive and lacking in candor. For example (pp. 31–32):

"Q  Have you to this day found out who told Mr. "R" to call you?

A  In all reality, probably not."

While our initial reaction to this testimony would probably be that it is untruthful on its face, it is unnecessary to reach such a conclusion. If plaintiff's *eminence grise* Dr. Norman is lying about how he came to the attorneys, then it is an unfit class representative. If his testimony is true, then it seems he acted improvidently and impetuously in retaining an attorney after four telephone conversations, never having met him, induced at least in part by a telephone conversation from a person ["R"] he does not know, and whose first name is unknown, and when he does not know how

that person came to recommend the attorney in the first place.

Dr. Norman's testimony about retaining the lawyers shows that he is unfit to be a class representative to prosecute claims in a fiduciary capacity for others who tendered stock. At the time of this bizarre occurrence, Dr. Norman and his enterprises had an attorney, one Conroy, who, if unwilling to act himself, could have forwarded the case through regular professional channels.

It now develops on reargument of the motion that stockbroker "R" has a customer, one Dr. "C", a physician, who would like to sue here in his own right, but has "an unwillingness to get involved [openly] because of a family relationship with [defendant Philip] Sassower, the moving force behind Arcs," (Affidavit sworn to June 15, 1976, hereinafter "Affid.").

After Dr. "C" and "R" had discussed the unfairness of the tender offer and the need for litigation, and after "C" had told "R" that his friend Norman was willing to sue, "R" set about formenting the litigation. His first step was to consult his brother-in-law, one "L", a legal assistant to a New York state court judge, who was formerly employed in the office of plaintiff's attorneys.

Before leaving the mysterious telephone call from "R" and the question of how plaintiff retained his present attorneys, we note that plaintiff's counsel concedes: (Affid. June 15, 1976, ¶¶ 5 and 7):

"On the recommendation of Dr. Norman, I also spoke to Dr. 'C' at least once prior to instituting suit since Dr. 'C' also knew a good deal about the transaction. I spoke to 'L' at least once concerning the lawsuit before it was commenced. * * [T]he undisputed facts are that the matter was referred to us through the recommendation of a former associate.   . ."

If "L", while serving in a confidential capacity in the state courthouse, did what it is apparently conceded he did, that is, recommended an attorney, and discussed the lawsuit with that attorney before it was commenced, such activities with respect to liti-

gation, part of which at least is also justiciable in that court, seem grossly improper.

There is more. In addition, Dr. Norman apparently has an animus against the co-defendant Philip S. Sassower, as does his intimate, Dr. "C". The Court believes Norman's animus is not as deep, bitter and lasting as defendants have argued, but any such personal vendetta intrudes unavoidably upon the fiduciary duty of the class representative in litigation of this sort.

Many class actions are brought in this District, but few are tried to judgment. The risk of defending a class action is so great, and the damages are so multiplied, that experience has shown even those substantially lacking in merit tend to be settled along the way. Besides the oft quoted duty of a class representative to prosecute the action vigorously [*Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y.1968); *Mersay v. First Republic Corporation of America*, 43 F.R.D. 465, 469 (S.D.N.Y.1968)], he also has the duty to use wise judgment in negotiating and approving a fair and proper settlement at the right time. While the Court can impose a settlement [*Saylor v. Lindsley*, 456 F.2d 896 (2d Cir. 1972)], this power should be exercised sparingly, and where animus exists, it is likely to be or to become, mutual. Defendants in such a case cannot be compelled, and are unlikely to be persuaded.

A class representative who is motivated by spite against a defendant is no different than one which has an adverse pecuniary interest. The same is true of a class representative who is a mere *alter ego* for one too embarrassed or otherwise constrained from suing in his own right [Dr. "C"]. Furthermore, Dr. Norman, in giving his deposition, has not been candid with the Court as to the nature, extent and origin of his dispute with Sassower.

His testimony in this regard is so garbled that it must be read in full. To quote it would unduly prolong this memorandum. See p. 173, *et seq.* of April 6, 1976 deposition, and also p. 140, *et seq.* In sum, it seems that, knowing Sassower, plaintiff had a "gut feeling" that the tender offer was inadequate. He believed Sassower, a director, was "not the type of individual who would protect the interests of the shareholders." Sassower had been Dr. Norman's stockbroker for some time prior to 1968 or 1969. He changed brokers then, but not out of distrust for Sassower. Later, plaintiff formed an adverse judgment of Sassower's character "[b]y looking at him" (P. 176), apparently, by "a sighting of him" (p. 175) at a bar mitzvah. It would be hard to justify selecting a person believing himself possessed of such occult powers, as a class representative.

As previously noted, on the deposition, questions were not answered responsively and directly by Dr. Norman. While it may be as much chargeable to counsel as to the witness, there was also a great deal of unnecessary obfuscation, delay and argument, over the form of questions, and whether questions were within the scope of permissible discovery. One who will not comply wholeheartedly and fully with the discovery requirements of modern federal practice, is not to be regarded by this Court as one to whom the important fiduciary obligation of acting as a class representative should be entrusted.

The record is clear that Dr. Norman's pension trust will maintain its $15,000.00 claim regardless of whether or not a class is certified, so there is no problem of "death knell."

Considerable time has passed since the tender offer complained of. The courthouse door does not appear beleaguered by others who tendered pursuant to this offer, and are anxious to litigate. If any such appear, whether or not telephoned by "R" they may be admitted as joined parties, or such lawsuits as they may file may be consolidated.

For the foregoing reasons the motion to certify the class is in all respects denied.

So Ordered.